**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DAVID N. STANLEY,

      Plaintiff,

vs.                             No. 1:11-cv-01108-GBW-WPL

DONALD GALLEGOS, individually and
in his official capacity as District Attorney,
Eighth Judicial District, State of New Mexico; and
ED OLONA,

      Defendants.

<u>**ORDER DENYING DEFENDANT GALLEGOS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

      THIS MATTER comes before the Court upon Defendant Gallegos' Motion for Summary Judgment (*doc. 115*).  The Court has reviewed the briefing on the motion (*docs. 125, 130*), held a hearing (*docs. 128, 142*), and reviewed the supplemental briefing ordered after the hearing (*docs. 145, 148*).  In his motion, Defendant Gallegos argues that he is entitled to qualified immunity as to all of Plaintiff's claims.  Plaintiff contends, *inter alia,* that "[a]s Mr. Gallegos was not acting within the 'course of performing' his job, he is not entitled to the presumption of qualified immunity . . . ."  *Doc. 125* at 31; *see also doc. 148*.  Because the Court finds that Defendant Gallegos' actions were clearly beyond the scope of his authority, he is not entitled to assert the defense of qualified immunity and his motion will be denied.

I.     UNDISPUTED FACTS

1.     Plaintiff owns real property ("Stanley Ranch") located within Colfax and Mora

       Counties in northern New Mexico.  *Doc. 125* at 2, ¶ A.[1]

2.     Red Hill Road passes through Stanley Ranch.  *Id*.  The road leads to the White

       Peaks area, a popular hunting and wildlife area in northeast New Mexico.  *Doc.*

       *115* at 2-3, ¶¶ 5, 7, 13; *doc. 125* at 11, ¶7; *see also doc. 40*, Ex. A ¶ 6.  Plaintiff has

       impeded access to this area via Red Hill Road by placing a locked gate on the

       road.  *Doc. 115* at 3-4, ¶¶ 7, 13; *doc. 125* at 2-3, ¶A; *doc. 125* at 11, ¶ 7.[2]

3.     At all relevant times, Defendant Donald Gallegos was the elected District

       Attorney for the Eighth Judicial District in the State of New Mexico, which

       includes Colfax County.  *Doc. 115*, Ex. 1 at 7:14-19

4.     On September 6, 2002, Defendant Gallegos sent Plaintiff a letter stating that he

       had received information that Plaintiff was planning to place a gate across Red

       Hill Road.  *Doc. 125*, Ex. C-4.  The letter advised Plaintiff "that [Red Hill Road] is

       a public road and any placement of a gate or any other obstruction will be dealt

       with appropriately, including, but not limited to, the filing of criminal charges

---

[1] For the most part, Defendant Gallegos does not dispute the "additional Undisputed Material Facts" in Plaintiff's Response.  *See doc. 130* at 2.  The only exceptions are Plaintiff's assertions that Red Hill Road was definitively or presumptively private.  *Id*.  Herein, the Court does not rely on any such assertions by Plaintiff.
[2] Plaintiff does not dispute that Red Hill Road leads to the White Peaks area, only that it is the only access to that area.

against you." *Id.* It does not appear that any action was taken as a result of this letter.

5.    The record does not reflect that any other exchanges occurred between Defendant Gallegos and Plaintiff for nearly ten years thereafter. However, at some point prior to August 2011, Plaintiff erected a metal gate that blocked access to Red Hill Road. He locked the gate with a chain and secured a barbed wire fence across the cattle guard. *Doc. 125* at 2, ¶ A. Plaintiff states that he constructed this gate because he was concerned about trespassing and illegal hunting on his property. *Doc. 125* at 3, ¶ B.

6.    On August 3, 2011, Defendant Gallegos sent Plaintiff a letter stating "I have been informed that you have placed a gate on the Red Hill Road that is the historical, traditional and publicly used access to State Trust Land in the area." *Doc. 160*, Ex. 1-5.[3] The letter informed Plaintiff that he did "not have any authority to place a gate on this road," and warned him that, if he failed to remove the gate immediately, Defendant Gallegos would "take any and all steps necessary to make sure that the gate is opened and/or removed." *Id.*

7.    On August 11, 2011, Plaintiff filed a Complaint to Quiet Title in state court concerning his title to the Stanley Ranch and Red Hill Road. *Doc. 125* at 5, ¶ M. Red Hill Road has never been adjudicated a public or private road, and the quiet

---

[3] For some background and other clearly undisputed facts, the Court relies on other materials in the record. *See* FED. R. CIV. P. 56 (c)(3).

title action is currently pending.  *Doc. 125* at 5-6, ¶¶ M, Q.

8.     Defendant Gallegos reached the conclusion that Red Hill Road was a public

road.[4]  *Doc. 115*, Ex. 1 at 37:9-12, 52:15-19, 109:6-9; *doc. 125*, Ex. A at 107:8-13.  In

making this determination, Defendant Gallegos reviewed documents and maps

submitted to him and relied on the research of others.  *E.g., doc. 115*, Ex. 1 at

147:11-149:12; 150:15-152:12.  The individuals he spoke with included Defendant

Ed Olona, "Alvin Garcia, who was at the Attorney General's Office at the time,"

individuals from Game & Fish, and "some of the elders who told [him] about the

uses of that road in generations past."  *Doc. 115*, Ex. 1 at 147:11-149:12.[5]

Defendant Gallegos did not, however, receive any input from Plaintiff.  *Doc. 115*,

Ex. 1 at 161:22-24.  Nor did he conduct his own independent research.  *Doc. 125*,

Ex. A at 159:13-19.

9.     Defendant Gallegos testified: "[I]t's my decision that [Red Hill Road] is public,

yes.  That is subject to judicial review at any and all times."  *Doc. 125*, Ex. A at

107:11-13.

10.    Having concluded that Red Hill Road was public, Defendant Gallegos

---

[4] Plaintiff disputes the accuracy and reasonableness of this opinion, but he does not dispute that
Defendant Gallegos subjectively held it.  *See doc. 125* at 11-13.

[5] Plaintiff disputes the quality and relevance of the evidence reviewed by Defendant Gallegos.  *See doc.
125* at 11-13.  For example, he contends that the "'oral histories' on which Mr. Gallegos purportedly relied
significantly post-dated the applicable patents . . . were not specific with regard to the alleged route of the
road, nor did they discuss the actual routes allegedly used . . . ."  *Doc. 125* at 12.  While Plaintiff contends
that the evidence considered by Defendant Gallegos was essentially worthless, he does not dispute that
he considered it.

determined that the obstruction Plaintiff had placed across the road was unlawful. *Doc. 115*, Ex. 1 at 93:1-4, 98:13-19.  His position was that the road needed to remain open at all times in order to allow public access to the White Peak area. *Doc. 115*, Ex. 1 at 120:2-121:8.

11. Defendant Gallegos decided not to pursue criminal charges against Plaintiff for blocking a public road. *Doc. 125* at 5, ¶ J.  He testified that, "instead of filing charges and wasting the taxpayer's money in the end, and maybe getting worse or who-knows-what result, I decided to just go open the gate." *Doc. 160*, Ex. 1 at 180:16-19; *see also doc. 125* at 3, ¶¶ C, D; *doc. 125* at 6, ¶¶ P, Q.

12. With Defendant Gallegos in charge, Red Hill Road was opened on August 24, 2011. *Doc. 115*, Ex. 1 at 80:21-24.  Prior to proceeding to the road and the locked gate, Defendant Gallegos told Patrick Casias, the Sheriff of Colfax County, "that he [Gallegos] would be taking action to open the locked gate . . . ." *Doc. 40*, Ex. A ¶ 7; *see also doc. 125* at 3, ¶ D.  Consequently, Sheriff Casias sent Undersheriff Steve Marquez to Red Hill Road on August 24, 2011, to "keep the peace." *Doc. 40*, Ex. A ¶ 10; *see also doc. 125* at 3, ¶ D.

13. Defendant Gallegos arrived at Red Hill Road that same day, accompanied by Defendant Olona, two deputies from the Mora County Sheriff's Department, and two from the Colfax County Sheriff's Department.  About eighteen private individuals were also present. *Doc. 125*, Ex. A at 63:23-64:4; Ex. B at 50:20-23.

14.     Defendant Gallegos used bolt cutters to cut the lock on the gate at Red Hill Road. *Doc. 125*, Ex. A at 85:16-86:4.  With the help of others, he removed barbed wire from the fence and the T-posts on the cattle guard.  *Doc. 125*, Ex. A at 86:5-16.

15.     Prior to opening the road, Defendant Gallegos did not determine whether there were any pending legal proceedings regarding the status of Red Hill Road, nor did he seek to obtain an order or injunction from any court.  *Doc. 125* at 6 ¶¶ O, P.

16.     Defendant Gallegos sent Plaintiff a letter dated August 26, 2011, stating that "[s]ince [he] did not hear back . . . regarding the letter . . ., [he had] taken action to open the gate on Red Hill Road" on August 24, 2011.  *Doc. 125*, Ex. C-6. Plaintiff was also informed that, "should [he] lock the metal gate or obstruct the cattle guard in any manner, [Defendant Gallegos would] take action to have criminal charges filed against [him] for obstructing a public road."  *Id.*  The letter informed Plaintiff that he should call Defendant Gallegos with any questions.  *Id.*

17.     A few weeks later, on September 10, 2011, Defendant Olona learned that the gate had been relocked.  He passed this information on to Defendant Gallegos, who again contacted Sheriff Casias.  *Doc. 125* at 4, ¶ F.

18.     Based on the direction of Defendant Gallegos, Sheriff Casias sent Deputy Tony Aguirre to Red Hill Road to open the road.  *Doc. 125* at 4, Ex. E, F; *see also doc. 40*, Ex. A ¶ 15; *doc. 136*, Ex. 3 ¶ 15.  Deputy Aguirre cut the lock and the chain on the

gate across Red Hill Road in order to reestablish public access to the White Peak

area.  *Doc. 125* at 4, Ex. E; *see also doc. 40*, Ex. A ¶ 17.

19.    The legal status of Red Hill Road has been disputed between Defendant Gallegos

and Plaintiff Stanley since at least 2002.  *Doc. 125* at 5, Ex. K.  At all relevant

times, Defendant Gallegos was aware of Plaintiff's position that Red Hill Road

was a private road.  *Doc. 125* at 5, ¶ L.

20.    On both August 24, 2011, and September 10, 2011, there were "No Trespassing"

signs posted near the gate.  *Doc. 125* at 4, ¶ H.

21.    No warrant for the search or seizure of any of Plaintiff's property has ever been

filed regarding the dispute over Red Hill Road.  *Doc. 125* at 5, ¶ J.  No criminal

charges have ever been filed against Plaintiff for blocking the road.  *Id.*

22.    Plaintiff was not offered compensation for any of the actions taken to open Red

Hill Road to the public on August 24, 2011, or September 10, 2011.  *Doc. 125* at 6-

7, ¶ S.

23.    On both these dates, there was an alternative access route to the White Peak area.

*Doc. 125* at 7, ¶ T.  No emergency or exigent circumstances existed on either date

which warranted the immediate opening of the road.  *Id.*, Ex. U.

## II.    RELEVANT LAW ON QUALIFIED IMMUNITY

The doctrine of qualified immunity shields "**government officials performing**

**discretionary functions** from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). Conversely, as numerous Circuit Courts have recognized, qualified immunity is not applicable "when an official 'performs an act clearly established to be beyond the scope of his discretionary authority." *Robbins v. City of Santa Fe*, 583 F. App'x 858, 864 (10th Cir. 2014) (unpublished) (quoting *In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997), *rehearing en banc denied*, 119 F.3d 1129 (4th Cir. 1997); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264-66 (11th Cir. 2004); *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996); *Mackey v. Duke*, 29 F.3d 1086, 1095 (6th Cir. 1994); *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301, 1310 (5th Cir. 1987). Unfortunately, no published Tenth Circuit opinion lays out the standards or burdens which apply when analyzing whether a public official can assert qualified immunity on this basis.

### A. Burden

The first question to resolve is which party has the burden of meeting the "within the scope" standard. On this point, the Circuit Courts are in significant agreement; the "burden of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties" falls on the defendant official. *In re Allen*, 106 F.3d at 594; *see also Holloman*, 370 F.3d at 1264-66; *Shechter*, 79 F.3d at 270; *Mackey*, 29 F.3d at 1095; *Burzynski*, 819 F.2d at 1310. In its unpublished

opinion on the matter, the Tenth Circuit agreed that the burden should be on the

defendant official.  *See Robbins*, 583 F. App'x at 864.  Thus, this Court concludes that

Defendant Gallegos bears the burden of meeting the "within the scope" standard.

### B.  Standard

The second issue is the precise nature of the "within the scope" standard.

Several courts have merely stated, without further explanation, that the defendant

official must demonstrate that the specific acts at issue were performed within the scope

of his official duties.  *See, e.g.*, *Shechter*, 79 F.3d at 270; *Mackey*, 29 F.3d at 1095; *Burzynski*,

819 F.2d at 1310.  Similarly, according to the Eleventh Circuit, the defendant official

must show that he was "engaged in a 'discretionary function' when he performed the

acts of which the plaintiff complains.  *Holloman*, 370 F.3d at 1264.  The standard most

protective of public officials comes from the Fourth Circuit, which places the burden on

the official, but holds that "an official's conduct falls within his authority *unless* a

reasonable official in the defendant's position would have known that the conduct was

clearly established to be beyond the scope of that authority."  *Allen*, 106 F.3d at 594

(emphasis in original).  This Court recognizes that, if applied too broadly, the "within

the scope" threshold question threatens to rob public officials of the important

protection of qualified immunity.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

("Qualified immunity balances two important interests—the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield

9

officials from harassment, distraction, and liability when they perform their duties reasonably.").  As such, the Fourth Circuit's standard best ensures that public officials who act reasonably, both in determining the scope of their authority and in executing that authority, are adequately protected from liability.  Moreover, in *Robbins*, the Tenth Circuit quoted the *Allen* opinion when it stated that qualified immunity is lost "when an official 'performs an act clearly established to be beyond the scope of his discretionary authority.'"  *Robbins*, 583 F. App'x at 864.  This Court will apply the *Allen* standard and ask whether Defendant Gallegos' actions were so clearly beyond his authority that a reasonable district attorney would have known so.

### C.  Analytical Framework

Another issue is the analytical structure that should be employed when applying this standard.  As should be clear, the focus is on the specific acts at issue.  *Shechter*, 79 F.3d at 270.  However, in determining whether an act is beyond the official's authority,

> the issue is neither whether the official properly exercised his discretionary duties, nor whether he violated the law. If these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of an official's authority.  Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.  The scope of immunity should be determined by the relation of the injury complained of to the duties entrusted to the officer.

*Allen*, 106 F.3d at 594 (quotations and citations omitted).  For example, "in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in *unconstitutional* searches and

seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities." *Holloman*, 370 F.3d at 1266 (emphasis in original).

The Eleventh Circuit has laid out a two-fold inquiry this Court finds useful: "We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id*. at 1265. When considering the first prong, however,

> we must be sure not to characterize and assess the defendant's act at too high a level of generality. Nearly every act performed by a government employee can be described, in general terms, as ostensibly "furthering the public interest." If we jump to such a high level of abstraction, it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. Consequently, we consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use excessive force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests.

*Id*. at 1266. The second prong of the test recognizes that:

> [t]he primary purpose of the qualified immunity doctrine is to allow government employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. Each government employee is given only a certain "arsenal" of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.
>
> Employment by a local, county, state, or federal government is not a carte blanche invitation to push the envelope and tackle matters far

beyond one's job description or achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

*Id*. at 1266-67.

### D.  Authority of a District Attorney Under New Mexico Law

Finally, the "determination of the scope of an official's authority depends upon an analysis of the statutes and regulations controlling the official's duties." *Allen*, 106 F.3d at 595 (citing *Doe v. McMillan*, 412 U.S. 306, 321-24 (1973) and *Barr v. Matteo*, 360 U.S. 564, 574-75 (1959)). In New Mexico, district attorneys have no common law powers. *State v. Reese*, 78 N.M. 241, 246-248 (1967). As such, the "constitution and statutes clearly prescribe and delimit his authority." *Id*. at 248. The parties agree that the specific sources of authority for New Mexico district attorneys are New Mexico Constitution Article VI, Section 24, and N.M. Stat. Ann. § 36-1-18 (1978). *See doc. 145* at 3; *doc. 148* at 2. The constitutional provision simply provides that the district attorney "shall perform such duties . . . as may be prescribed by law." N.M. Const. art. VI, § 24. Of the various duties laid out in the statute, Defendant Gallegos points the Court to only one as the font for his exercise of power in the instant case – "Each district attorney shall [] prosecute and defend for the state in all courts of record of the counties of his district all cases, criminal and civil, in which the state or any county in his district may be a party or may be interested . . . ." N.M. Stat. Ann. § 36-1-18(A)(1) (1978); *see doc.*

*145* at 2-4.  Additionally, "New Mexico district attorneys' constitutional and statutory duties include duties incidental and necessary to the discharge of duties prescribed by the Constitution or statutes."  *Candelaria v. Robinson*, 93 N.M. 786, 791 (Ct. App. 1980).

### E.  Conclusion

In sum, the issue before the Court is whether Defendant Gallegos acted outside the scope of his authority as a New Mexico district attorney such that he is not entitled to qualified immunity.  To resolve this issue, the Court asks whether "a reasonable official in the defendant's position would have known that [his] conduct was clearly established to be beyond the scope of [his] authority."  *Allen*, 106 F.3d at 594.  In making this determination, the Court considers whether Defendant Gallegos was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  *Holloman*, 370 F.3d at 1265.

Ultimately, the Court concludes that Defendant Gallegos is not entitled to qualified immunity for his actions in removing the fence across Red Hill Road.

## III.   ANALYSIS

Since at least 2002, the nature of Red Hill Road has been in dispute.  Defendant Gallegos subjectively believed that the road was public and could not be obstructed by a private party.  Plaintiff Stanley subjectively believed that the road was his private

road to which he could control access.  Both parties were aware of the other's position.

In or about August 2011, Plaintiff erected a metal gate that blocked access to Red Hill

Road.  He locked the gate with a chain and secured a barbed wire fence across the cattle

guard.  Plaintiff states that he constructed this gate because he was concerned about

trespassing and illegal hunting on his property.

On August 3, 2011, Defendant Gallegos sent Plaintiff a letter stating "I have been

informed that you have placed a gate on the Red Hill Road that is the historical,

traditional and publicly used access to State Trust Land in the area."  *Doc. 160*, Ex. 1-5.

The letter informed Plaintiff that he did "not have any authority to place a gate on this

road," and warned him that, if he failed to remove the gate immediately, Defendant

Gallegos would "take any and all steps necessary to make sure that the gate is opened

and/or removed."  *Id.*  On August 11, 2011, Plaintiff filed a Complaint to Quiet Title in

state court concerning his title to the Stanley Ranch and Red Hill Road.  *Doc. 125* at 5, ¶

M.  The public or private status of Red Hill Road has never been adjudicated and the

quiet title action is currently pending.  *Doc. 125*, Ex. A at 168:1-9; *doc. 127* at 2, ¶ 6.

N.M. Stat. Ann. § 67-7-1 (1978) makes it a crime to "obstruct any public road in

this state" punishable by a fifty dollar fine, the costs of prosecution, and thirty days of

imprisonment.  However, Defendant Gallegos decided not to pursue criminal charges

against Plaintiff under that, or any other, statute.  He testified that, "instead of filing

charges and wasting the taxpayer's money in the end, and maybe getting worse or who-knows-what result, I decided to just go open the gate." *Doc. 160*, Ex. 1 at 180:16-19. Indeed, on August 24, 2011, Defendant Gallegos contacted Patrick Casias, the Sheriff of Colfax County, and informed him "that he [Defendant Gallegos] would be taking action to open the locked gate . . . ." *Doc. 40*, Ex. A ¶ 7.  Defendant Gallegos arrived at Red Hill Road that same day and personally used bolt cutters to cut the lock on the gate at Red Hill Road.  Present and observing were approximately eighteen private citizens, and four sheriff deputies from the Mora and Colfax County Sheriff's Departments, who were there to "keep the peace."  With the help of some of the other individuals, Defendant Gallegos also removed barbed wire from the fence and the T-posts on the cattle guard.  *Doc. 125*, Ex. A at 86:5-16.

A few weeks later, on September 10, 2011, Defendant Olona learned that the gate had been relocked.  He passed this information on to Defendant Gallegos, who again contacted Sheriff Casias.  *Doc. 125* at 4, ¶ F.  Based on the direction of Defendant Gallegos, Sheriff Casias sent Deputy Tony Aguirre to Red Hill Road to open the road. *Doc. 40*, Ex. A ¶ 15; *doc. 136*, Ex. 3 ¶ 15.  Deputy Aguirre cut the lock and the chain on the gate across Red Hill Road.  *Doc. 40*, Ex. A ¶ 17.

In short, Defendant Gallegos decided that Red Hill Road was a public road, personally enforced that decision, and directed law enforcement officers to enforce that

decision.  These actions caused the destruction, removal and seizure of Plaintiff's

property.  In order to assert the qualified immunity defense, Defendant Gallegos has the

burden of demonstrating that  a reasonable district attorney in New Mexico would not

have known these actions to be outside the scope of his authority.  The existence of a

statute criminalizing the obstruction of a public road does indicate that keeping public

roads free of obstruction is a legitimate job-related function of a district attorney.  *See*

*Holloman*, 370 F.3d at 1265.  Thus, Defendant Gallegos had every right to consider and

reach his own conclusion about whether Red Hill Road was a public road.

Nevertheless, having made that decision, he could proceed only "through means that

were within his power to utilize."  *Id*.  Defendant Gallegos cannot demonstrate that a

reasonable district attorney would not have known that the means he used were clearly

outside his authority.

Defendant Gallegos discusses only one express statutory grant of power when he

argues that his actions were within the scope of his authority -- "Each district attorney

shall [] prosecute and defend for the state in all courts of record of the counties of his

district all cases, criminal and civil, in which the state or any county in his district may

be a party or may be interested . . . ."  N.M. Stat. Ann. § 36-1-18(A)(1) (1978); *see doc. 145*

at 2-4.  Defendant Gallegos repeatedly emphasizes the "broad discretion in charging"

that a district attorney is granted.  *See id*. at 3-4.  He argues that, "because 'prosecutorial

discretion in charging is quite broad' a district attorney's discretion includes whether to

16

refrain from charging entirely." *Id*. at 3.  From this uncontroversial position, Defendant

Gallegos boldly asserts that "[f]urther, should he instead choose to use his authority to

address the unlawful conduct by other means such authority *will only be limited* given

clear evidence of an intent by the Legislature to limit the district attorney's discretion."

*Id*. (emphasis in original).  In support of this extraordinary claim of power, Defendant

Gallegos cites to two New Mexico opinions.  *Doc. 145* at 3-4 (citing *State v. Santillanes*,

130 N.M. 464 (2001) and *State v. Chavez*, 93 N.M. 270, 274 (Ct. App. 1979)).  However,

both those cases addressed criminal defendants' arguments that the law somehow

prohibited the district attorney from bringing a particular criminal charge.  In each case,

the court rejected the argument based upon the "absence of limitation upon the district

attorney's authority *as prosecutor*." *Chavez*, 93 N.M. at 274 (emphasis added).  In no way

do those cases stand for the proposition that a district attorney has plenary power to act

in the public's interest unless explicitly prohibited by the legislature.  Moreover, this

proposition is directly refuted by the well-established rule that New Mexico district

attorneys have no common law powers and are limited to those given by the

constitution and statutes.  *See Reese*, 78 N.M. at 246-248.

> As Plaintiff aptly points out,

> Under Defendant Gallegos' rationale, he could engage in a whole host of
> alternative measures to filing criminal charges. For example, he could
> determine that an alleged theft of, say, a lawnmower by a neighbor was
> too "petty" to bring criminal charges, but then "decide" to whom the

> lawnmower actually belonged, seize it and return it to the "rightful"
> owner, and impose a penalty of community service on the alleged thief.
> All without an opportunity to present evidence and testimony on behalf
> of the accused in a Court of law.

*Doc. 148* at 2.

Even though the law does not support Defendant Gallegos' broad assertion of power, his actions could still be within the scope of his authority if they were "incidental and necessary to the discharge" of his constitutional or statutory duties. *Candelaria*, 93 N.M. at 791; N.M. Stat. Ann. § 36-1-18 (1978).  However, incidental powers are only those powers "that may fairly be implied . . . [from] powers expressly granted by statute."  *Candelaria*, 93 N.M. at 791.  For his part, Defendant Gallegos contends that his actions were justified by a "combination of his prosecutorial, investigative and administration roles."  *Id*. at 7.  Defendant Gallegos does not clearly identify the constitutional or statutory authority to which his actions were incidental and/or necessary.  Because he discusses only his authority to prosecute and defend criminal and civil cases on behalf of the state or any county in his district, the Court will consider only that duty as the supposed source of incidental powers.  N.M. Stat. Ann. § 36-1-18(A)(1) (1978)

The fatal flaw in Defendant Gallegos' argument is that he specifically elected to operate *outside* of the judicial system in taking these actions.  He testified that, "instead of filing charges and wasting the taxpayer's money in the end, and maybe getting worse

or who-knows-what result, I decided to just go open the gate." *Doc. 160*, Ex. 1 at 180:16-19; *see also doc. 125* at 3, ¶¶ C, D; *doc. 125 at 6*, ¶¶ P, Q (emphasis added).  Having made that choice prior to acting, Defendant Gallegos cannot now argue that his actions in destroying the gate were incidental to, let alone necessary for, pursuing his powers to prosecute crime or represent the counties in court.

He was not present to investigate possible criminal activity or determine whether he should file charges or some other legal action.  Neither before the gate was removed on August 24 and September 10, 2011, nor thereafter, did Defendant Gallegos initiate civil or criminal proceedings related to Red Hill Road or the obstruction.  He presented no requests for judicial authorization prior to his action, and therefore possessed no order, injunction or warrant from any court or judge.  Nor did Defendant Gallegos determine whether there were any pending legal proceedings regarding the status of Red Hill Road, or ever attempt to intervene in the pending state quiet title action.  *Doc*. 125 at 6 ¶¶ O, P.  No emergency or exigent circumstances were present that required immediate action, and, in any event, Defendant Gallegos did not file any subsequent complaint or other judicial pleading related to his removal of the gate on either occasion.  Defendant Gallegos failure to exercise of any of these options were not the result of mistake, a reconsideration or changed circumstances.  They were the result of an intentional choice to act extra-judicially.

It cannot be said that the authority to enforce the law *in court* fairly implies the

authority to enforce it by whatever means seem convenient.  Defendant Gallegos'

actions in enforcing his unilateral decision that Red Hill Road was public bear no

resemblance to the duties or powers of a New Mexico district attorney.  As such,

Defendant Gallegos has failed to meet his burden to establish that the actions for which

he seeks qualified immunity were not clearly outside his scope of authority.  Therefore,

he cannot assert the defense of qualified immunity with respect to the removal of

Plaintiff's property on August 24, 2011 and September 10, 2011, and his motion for

summary judgment on that basis must be denied.

## IV.   OFFICIAL CAPACITY CLAIMS

Defendant Gallegos' Motion for Summary Judgment seeks dismissal of all

claims.  Apparently, this request includes the claims brought against him in his official

capacity.  *See doc. 142*.  An official capacity claim is tantamount to a claim against the

relevant governmental entity.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Governmental

entities cannot assert the defense of qualified immunity.  *See Leatherman v. Tarrant Cnty.*

*Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993).  Therefore, the official

capacity claims against Defendant Gallegos cannot be dismissed on the basis of

qualified immunity.  However, a government entity can be liable under § 1983 only

based on (1) an express municipal policy, such as an ordinance, regulation, or policy

statement; (2) a "widespread practice that, although not authorized by written law or

20

express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); or (3) the decision of a person with "final policymaking authority," *Praprotnik*, 485 U.S. at 123.

Plaintiff has not alleged that the governmental entity[6] had any policy or practice which would support liability under the first or second prong. With respect to the third prong, "the mere exercise of discretion by a county official is not sufficient." *Starrett v. Wadley*, 576 F.2d 808, 818 (10th Cir. 1989). Rather, "[t]he official must also be responsible for establishing final government policy respecting [a particular exercise of discretion] before the municipality can be held liable." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986)). The Court has ruled that Defendant Gallegos acted outside his authority as a government official, so the third prong is also inapplicable. Therefore, Plaintiff cannot establish governmental liability under any of the three prongs.

Consequently, Plaintiff's official capacity claims against Defendant Gallegos would be subject to dismissal.[7] Because he contends that he acted within the scope of his official authority, Defendant Gallegos did not present this argument as a basis for dismissing the official capacity claims. Therefore, if Plaintiff objects to the dismissal of

---

[6] The identity of the relevant governmental entity is disputed. *See docs. 160, 165*.

[7] This result would also render Defendant Gallegos' Motion for Summary Judgment on the basis of Eleventh Amendment Immunity (*doc. 160*) moot.

the official capacity claims against Defendant Gallegos on this basis, and the denial as

moot of Defendant Gallegos' Motion for Summary Judgment on the basis of Eleventh

Amendment Immunity (*doc. 160*), he shall file a brief noting his objection and arguing

its basis no later than fourteen days from the date of this order.  *See* FED. R. CIV. P.

56(f)(2).  Should he wish to do so, Defendant Gallegos may file a response thereto

within fourteen days of Plaintiff's filing.

## V.    CONCLUSION

For the reasons described above, Defendant Gallegos' Motion for Summary

Judgment (*doc. 115*) is hereby DENIED.

IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**