**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DAVID N. STANLEY,

      Plaintiff,

v.                                              Civ. No. 11-1108 GBW/JHR

DONALD GALLEGOS, *et al.*,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant Gallegos's renewed Motion for Summary Judgment on Qualified Immunity Grounds (*doc. 196*) and Defendant Gallegos's Motion for Summary Judgment (*doc. 160*) on the basis of Eleventh Amendment and absolute prosecutorial immunity. The Court has reviewed the Motions and related briefing (*docs. 197, 202, 165*), and has heard oral argument on the Motions (*docs. 205, 207, 208*).

For the reasons explained more fully below, the Court finds: (1) the Eighth Judicial District Attorney's Office is an arm of the state of New Mexico and Plaintiff's official-capacity § 1983 claims against the office are therefore precluded by Eleventh Amendment immunity; (2) Defendant Gallegos was not acting in his role as a prosecutor when he took the actions at issue and is thus not entitled to absolute prosecutorial immunity on any of Plaintiff's claims; (3) Plaintiff has met his burden of showing that Defendant Gallegos violated both Plaintiff's Fourteenth Amendment right

to procedural due process and his Fourth Amendment right against unreasonable seizures in taking the actions at issue; (4) however, Plaintiff has not met his burden to show that Defendant Gallegos violated clearly established law which entitles Defendant Gallegos to qualified immunity on Plaintiff's individual-capacity § 1983 claims for monetary relief; and (5) Plaintiff's claims for injunctive relief are not foreclosed by either qualified immunity or the Eleventh Amendment.

Therefore, the Court will GRANT IN PART and DENY IN PART Defendant Gallegos's Motion for Summary Judgment asserting Eleventh Amendment and absolute prosecutorial immunity (*doc. 160*), and will GRANT IN PART and DENY IN PART Defendant Gallegos's Motion for Summary Judgment on Qualified Immunity Grounds (*doc. 196*).

I.    BACKGROUND

The central dispute giving rise to the events underlying this litigation is whether a road traversing Plaintiff's property, Red Hill Road, is public or private. Plaintiff is a rancher whose ranch ("Stanley Ranch") is located in both Colfax and Mora Counties, New Mexico.

On September 6, 2002, Defendant Donald Gallegos, the New Mexico District Attorney representing Taos, Colfax, and Union Counties, sent Plaintiff a letter stating that he had received information that Plaintiff was planning to place a gate across Red Hill Road. Defendant Gallegos believed Red Hill Road was a public road pursuant to

43 U.S.C. § 932, also known as Revised Statute 2477 ("R.S. 2477"). *See doc. 158* at 5, 9;
*doc. 158-2* at 7-9. Accordingly, the letter warned Plaintiff that Red Hill Road "is a public
road and any placement of a gate or any other obstruction will be dealt with
appropriately, including, but not limited to, the filing of criminal charges against you."
*Doc. 125*, Ex. C at 1.

Sometime thereafter, Plaintiff, believing Red Hill Road to be his private property,
erected a gate to block access to the road by the public. He placed the gate at the county
line where Red Hill Road crosses from Mora County into Colfax County. Nine years
after sending the first letter, on August 3, 2011, Defendant Gallegos sent Plaintiff
another letter on official stationery informing Plaintiff that he had no authority to place
a gate on the road and "requesting" that he remove it. *See doc. 160-1* at 17. The letter
further stated that, "Should you fail to do so, I will take any and all steps necessary to
make sure that the gate is opened and/or removed." *Id*. On August 11, 2011, Plaintiff
filed a quiet title action in New Mexico's Eighth Judicial District Court, claiming title to
Stanley Ranch, including the portion of Red Hill Road that traverses the ranch. *Doc. 21*
at 2.[1] Thirteen days later, on August 24, 2011, Defendant Gallegos, along with
Defendant Ed Olona and several other individuals including officers from the Mora and
Colfax County Sheriff's Departments, went to the gate on Red Hill Road. *Doc. 125* at 1-
2. Together, they removed the obstruction from the road by cutting the locked chain

---

[1] The quiet title action is still pending and is presently scheduled for trial in March 2018. *See doc. 202* at 3;
*doc. 205* at 2.

securing the gate, and by removing a barbed-wire fence and T-posts set up at the cattle crossing. *Doc. 21* at 3; *doc. 40* at 4. The T-posts, fence, and gate itself were left at the scene, although not intact. *See id.*

On August 26, 2011, Defendant Gallegos sent Plaintiff a letter on his official letterhead informing him:, "Since I did not hear back from you regarding the letter I had sent you, I have taken action to open the gate on Red Hill Road." *See doc. 21*, Ex. C. Defendant Gallegos reiterated that Red Hill Road "is a public road" and that if Plaintiff locked the gate or obstructed the cattle guard again, he would "take action to have criminal charges filed against [Plaintiff] for obstructing a public road." *Id.* Plaintiff did not heed this letter and instead erected the gate again soon thereafter. On September 10, 2011, a Colfax County Deputy Sheriff, Tony Aguirre, went to Red Hill Road along with Defendant Olona and others to again unlock the gate. Plaintiff alleges that the second unlocking was done at Defendant Gallegos's direction. *Doc. 21* at 3-4. County Sheriff Patrick Casias swore by affidavit that, based on Defendant Gallegos's previous legal advice that the road was public, Sheriff Casias instructed Deputy Aguirre to remove the obstruction after receiving a phone call from Defendant Olona that the gate was again locked. *Doc. 40-1* at 3.

On December 19, 2011, Plaintiff filed this action pursuant to 42 U.S.C. § 1983, alleging various constitutional violations on the basis that Defendants' actions constituted (1) an unlawful taking of private property for public use without just

compensation in violation of the Fifth Amendment; (2) an unreasonable search and seizure in violation of the Fourth Amendment; and (3) deprivation of his property without due process in violation of the Fourteenth Amendment. *See doc. 21* at 5-7. In addition, Plaintiff alleged violations of the New Mexico Constitution on the same grounds and brought state law statutory trespass claims against various Defendants.

The procedural history of this case is extensive and will not be recounted in its entirety here. Pertinent to the present motions, Defendant Gallegos moved for summary judgment on the basis of qualified immunity on January 30, 2015. *Doc. 115.* The Court denied that motion on August 25, 2015, ruling that Defendant Gallegos acted outside the scope of his authority as a district attorney when he removed the gate from Red Hill Road, and he was therefore not entitled to invoke qualified immunity. *Doc. 167.* The Court's qualified immunity ruling was appealed to the Tenth Circuit Court of Appeals on September 18, 2015. *Doc. 176.* On March 17, 2017, in a 1-1-1 decision, the Court of Appeals overturned the Court's ruling and remanded the case for a qualified immunity analysis absent application of a scope-of-authority exception. *See doc. 191.* The Court of Appeals denied Plaintiff's petition for a rehearing *en banc* on June 7, 2017.

Prior to the appeal on the qualified immunity issue, on July 10, 2015, Defendant Gallegos filed a separate Motion for Summary Judgment in which he asserted both Eleventh Amendment Immunity and absolute prosecutorial immunity as alternative grounds for dismissing the claims against him. *See doc. 160.* That motion was fully

briefed but remained pending while the qualified immunity issue was on appeal. *See doc. 165*.

Following remand, the parties were ordered to file supplemental briefing regarding Defendant Gallegos's assertion of qualified immunity, which was completed on August 24, 2017. *See docs. 194, 196, 197, 202*. On September 11, 2017, the Court held a motion hearing regarding all pending motions in the case, including Defendant Gallegos's renewed Motion for Summary Judgment on Qualified Immunity Grounds (*doc. 196*) and his Motion for Summary Judgment on the basis of Eleventh Amendment and absolute prosecutorial immunity (*doc. 160*). *See docs. 195, 198, 205*. Both motions are now ripe for ruling.[2]

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, the non-moving party is required to designate specific

---

[2] Because these motions concern Plaintiff's federal claims, this Order does not address his state law statutory trespass claims, which are the subject of separate briefing (*docs. 168, 170*) and thus will be addressed by separate order.

facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

However, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. Qualified immunity is "designed to protect public officials from spending inordinate time and money defending erroneous suits at trial." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008). Therefore, when a public official is entitled to qualified immunity, the entitlement relieves the official from bearing any of the burdens of litigation, including discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). The Supreme Court "has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except 'the plainly incompetent or those who knowingly violate the law,'" in order to avoid unduly inhibiting officers in performing their official duties. *Wilson v. City of Lafayette*, 510 F. App'x 775, 780 (10th Cir. 2013) (unpublished) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001)). The qualified immunity standard allows government officials "ample room for mistaken judgments," shielding them from liability for reasonable error. *Applewhite v. U.S. Air Force*, 995 F.2d 997, 1000 (10th Cir. 1993) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Thus, qualified immunity is "applicable unless the official's conduct violated a clearly established constitutional

right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). For that reason, "'clearly established law' should not be defined 'at a high level of generality." *Pauly v. White*, 137 S.Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 724 (1987)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Whether the motion for summary judgment is based on qualified immunity or not, the Court decides the motion on the basis of the facts as construed in the light most favorable to the non-moving party. Consequently, it must keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).

Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *see also Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that courts generally "accept the facts as the plaintiff alleges them" when considering whether a plaintiff has overcome

defendant's assertion of qualified immunity at the summary judgment stage).
However, "a plaintiff's version of the facts must find support in the record" at the
summary judgment stage. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S.
at 255. "[T]o survive the . . . motion, [the non-movant] need only present evidence from
which a jury might return a verdict in his favor." *Id*. at 257.

## III. PLAINTIFF'S OFFICIAL-CAPACITY CLAIMS FOR DAMAGES ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY

### A. Legal Standard

The Eleventh Amendment provides: "The Judicial power of the United States
shall not be construed to extend to any suit in law or equity, commenced or prosecuted
against one of the United States by Citizens of another State, or by Citizens or Subjects
of any Foreign State." Const. amend. XI. Only a state or "arms" of a state may assert
the Eleventh Amendment as a defense to suit in federal court. *Sutton v. Utah State Sch.
for Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999).

"It is inherent in the nature of sovereignty not to be amenable to the suit of an
individual without its consent." *Hans v. Louisiana*, 134 U.S. 1, 13 (1890). Thus, the
Eleventh Amendment has long been recognized as rendering states and state entities
immune to suit in federal court generally. *See College Sav. Bank v. Fla. Prepaid
Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669 (1999). However, that immunity "is
not absolute" and there are two circumstances in which it does not apply: (1) where

Congress has "authorize[d] such a suit in the exercise of its power to enforce the Fourteenth Amendment" and (2) where a state has "waive[d] its sovereign immunity by consenting to suit." *Id.* at 670.

"As long as the government entity receives notice and an opportunity to respond," a claim brought against a public official in his official capacity "is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Congress did not abrogate Eleventh Amendment immunity when it enacted 42 U.S.C. § 1983. *Quern v. Jordan*, 440 U.S. 332, 345 (1979). Accordingly, states (and state officials sued in their official capacities) cannot be sued for damages under § 1983.[3] *Will*, 491 U.S. at 71. Therefore, whether Eleventh Amendment immunity bars Plaintiff's official-capacity claims against Defendant Gallegos depends on whether those claims have been brought against a state entity or a municipal entity.

Defendant Gallegos asserts that the Eleventh Amendment precludes the official-capacity claims against him because he is a state actor who acted as an official of the

---

[3] Eleventh Amendment immunity does not protect against official-capacity suits seeking only prospective injunctive or declaratory relief. *Papasan v. Allain*, 478 U.S. 265, 276-78 (1986). Plaintiff does seek a permanent injunction against all Defendants, their agents, and employees, from trespassing on or damaging his property or from interfering with any and all measures taken by Plaintiff to maintain the roads on his property as private roads. *See doc. 21* at 11. The Court will address the injunctive relief claim below.

Eighth Judicial District Attorney's Office.  *See doc. 160* at 8-10.  The law governing

whether an entity is an "arm of the state" for purposes of Eleventh Amendment

immunity against official-capacity claims:

> turns on whether the [entity] is to be treated as an arm of the State
> partaking of the State's Eleventh Amendment immunity, or is instead to
> be treated as a municipal corporation or other political subdivision to
> which the Eleventh Amendment does not extend.  The answer depends, at
> least in part, on the nature of the entity created by state law.

*Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000) (alteration in original) (quoting

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).  In short, "the

inquiry with regard to a particular entity is whether it is more like a county or city than

. . . like an arm of the state[.]"  *Id.* (internal quotations and citation omitted).  Moreover,

though it is "ultimately a matter of federal law, arm-of-the-state status must be

determined in each case by reference to the particular state laws characterizing the

entity."  *Id.*

In the Tenth Circuit, determining whether a particular governmental entity is an

"arm of the state" requires an examination of the following four factors: "(1) the

characterization of the governmental unit under state law; (2) the guidance and control

exercised by the state over the governmental unit; (3) the degree of state funding

received; and (4) the governmental unit's ability to issue bonds and levy taxes on its

own behalf."  *Sutton*, 173 F.3d at 1232 (citing *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992,

994 (10th Cir. 1993)).  These factors are commonly called the "*Mt. Healthy* factors," after

the Supreme Court decision which first applied these factors to reject an Ohio school district board's assertion of Eleventh Amendment immunity. Previously in the Tenth Circuit, the third and fourth *Mt. Healthy* factors had been characterized as the second prong of a two-pronged inquiry, which required the court to "examine[] the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing. The governmental entity is immune from suit if the money judgment sought is to be satisfied out of the state treasury." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574-75 (10th Cir. 1996) (internal citations omitted).

This approach does not mean that a plaintiff can avoid Eleventh Amendment immunity by simply asking the Court to craft its order so that a money judgment is not paid out of the state treasury. Rather, the Tenth Circuit has cautioned courts "to focus on legal liability for a judgment, rather than [the] practical, or indirect, impact a judgment would have on a state's treasury." *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 981 (10th Cir. 1997). In other words, "'it is the entity's **potential legal liability**, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant" in determining whether the entity is entitled to Eleventh Amendment immunity. *Id.* (emphasis added) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997)). Or, as the Supreme Court explained in *Doe*: "The question is not who pays in the end; it is who is legally obligated to pay the judgment that is being sought." 519 U.S. at 428 (quotations and citation omitted).

## B.    Analysis

Defendant Gallegos asserts that, when he took the actions underlying this litigation, he was acting in his official capacity as an official of a state agency—namely, the Eighth Judicial District Attorney's office.  *See doc. 160* at 8-10.  Thus, because "state entities and state employees acting in their official capacities are entirely immune from suit under the Eleventh Amendment," he argues that the official-capacity claims against him must be dismissed.  *See id.* at 9.

In response to Defendant Gallegos's assertion of Eleventh Amendment immunity, Plaintiff initially argued that Defendant Gallegos "was acting 'on behalf of' Colfax County, and not the State of New Mexico," when he took the allegedly unconstitutional actions underlying this litigation.  *Doc. 165* at 1.  This argument compelled the Court to hold a hearing regarding whether Colfax County was a necessary party to the case pursuant to Fed. R. Civ. P. 19, because "[i]f the Court were to accept Plaintiff's theory, Colfax County could be exposed to municipal liability stemming from Plaintiff's official-capacity § 1983 claims."  *Doc. 206* at 2 (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 707-08 (1978)).  However, during the December 8, 2017 hearing on the possible necessity of joinder of the County, Plaintiff's counsel clarified that the official-capacity claims in this case are brought against the governmental entity of the Eighth Judicial District Attorney's Office for the State of

New Mexico, not against Colfax County.[4]  This explicit concession forecloses the need to

analyze whether Defendant Gallegos acted "on behalf of" the State or the County,

which might otherwise be necessary to determine against which entity Plaintiff brings

his official-capacity claims.  *See McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 786 (1997).

    As noted above, an official-capacity suit "is, in all respects other than name, to be

treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. at 165.  Unlike Colfax

County, the district attorney's office is an arm of the state and is therefore entitled to

Eleventh Amendment immunity against Plaintiff's official-capacity claims.  *Jackson v.*

*N.M. Pub. Def.'s Office*, 361 F. App'x 958, 961-62 (10th Cir. 2010) (unpublished) (agreeing

with the trial court that the office of the district attorney in New Mexico is an arm of the

state and thus "protected from suit by the Eleventh Amendment"); *Macias v. Griffin*, 612

F. App'x 532, 534 (10th Cir. 2015) (unpublished) ("Dismissal of the claims against [New

Mexico's Fifth Judicial] [D]istrict [A]ttorney's [O]ffice was also appropriate because it is

a state office that is both protected by the Eleventh Amendment and not subject to suit

under § 1983"); *Vacek v. Court of Appeals, Santa Fe, N.M.*, 325 F. App'x 647, 649 (10th Cir.

---

[4] Specifically, Plaintiff's counsel John Hays explained:

> I think there has been some lack of clarity in the case about what entity we are dealing
> with here.  And as you know, an official[-]capacity claim is a claim not against the
> individual, but against the responsible entity.  And I think here, the entity is not the
> county of Colfax.  The entity is the office of the Eighth Judicial District Attorney.  That's
> who Mr. Gallegos was acting as an agent of.

*Doc. 207*, Joinder Hr'g Tr. at 7:20-8:3.  Mr. Hays further explained that "it's key that [the Eighth Judicial
District Attorney's Office is] an independent office.  So the judgment, in an official capacity, would be
against [Defendant Gallegos] in his official capacity or against his office, but it would not be against
Colfax County."  *Id.* at 9:15-19.

2009) (unpublished) (holding that "the New Mexico courts and agencies listed as defendants," which included the Second Judicial District Attorney's Office, "are not entities against which 42 U.S.C. § 1983 . . . claims may be lodged given Eleventh Amendment immunity"); *Ysais v. Richardson*, Civ. No. 07-0287, JB/RLP, 2008 WL 4861697, at *5 (D.N.M. July 9, 2008) (holding that the Thirtieth Judicial District Attorney's Office in New Mexico is a state entity immune from suit under the Eleventh Amendment); *Luginbuhl v. City of Gallup, et al.*, Civ. No. 12-1199, KG/SMV, 2016 WL 10592141, at *5 (D.N.M. Jan. 28, 2016) (same holding regarding the Eleventh Judicial District Attorney's Office of New Mexico); *James v. Dist. Attorney's Office*, Civ. No. 16-1183, MV/GBW, 2017 WL 3405555, at *3 (D.N.M. Mar. 24, 2017) (proposing the Court find that the Ninth Judicial District Attorney's Office is a state entity protected from § 1983 claims by the Eleventh Amendment), *adopted in* Order Adopting Report and Recommendations, *doc. 12* in 16-cv-1183 MV/GBW (D.N.M. Apr. 28, 2017). Plaintiff points to no authority to support a finding that a New Mexico District Attorney's Office is not a state agency. *See generally doc. 165.* Rather, as noted above, he asks the Court to analyze whether Defendant Gallegos acted "on behalf of" Colfax County instead of the State of New Mexico. *Id.* at 1, 5-10. Such an analysis is not appropriate in light of Plaintiff's concession that his official-capacity claims are not brought against Colfax County.

The only apparent alternative would be a finding that, for the purposes of this

case, the Office of the District Attorney for the Eighth Judicial District was a county

agency.  Yet Plaintiff's counsel has repeatedly disclaimed such an argument.  The

following colloquy between Plaintiff's counsel and the Court during the joinder hearing

is illustrative:

> MR. HAYS: . . . [Colfax] [C]ounty . . . has never expressed an interest in coming into this case.  They don't want to have anything to do with this[.]
>
> THE COURT: Well, they may feel a lot different if I say [Defendant Gallegos is] a county official and he gets qualified immunity as an individual . . . but he was acting as a final policymaker for [the county] . . . and, therefore, there's a judgment against the county.
>
> MR. HAYS: Well, again, I don't think it would be a judgment against the county.  It would be a judgment against Mr. Gallegos in his official capacity, not against Colfax County.
>
> It may be collectable [from the county] through a constitutional provision . . . but it's not a judgment against Colfax County.  It's not a finding that Colfax County or the Board of County Commissioners of Colfax County did anything wrong.
>
> It would be a finding that Mr. Gallegos . . . in his official capacity, in his office, violated [Plaintiff's] constitutional rights, not that the county did. . . .
>
> We enumerated all the factors that showed [Defendant Gallegos] was, in fact, acting on behalf [of] or [in] the interest of a county here [in Plaintiff's Eleventh Amendment immunity briefing].  But that doesn't mean that Colfax County is somehow liable or responsible or implicated.
>
> THE COURT: Then who is?
>
> MR. HAYS: The office of the district attorney.
>
> THE COURT: And so this judgment is against their budget?
>
> MR. HAYS: Well, it's a judgment against them.  And the . . . constitutional provision [of Article 8, Section 7 of the New Mexico Constitution] says:

"No execution shall issue upon a judgment rendered against any officer of any county recovered against him in his official capacity and for which the county is liable, but the same should be paid out of the proceeds of a tax levy."

. . .

MR. HAYS: It's a judgment against the official which the county pays through a special tax levy. That's what the constitutional provision is.

THE COURT: . . . I'm familiar with that. That's what happens in every case against the county. That doesn't – I mean, I've never had somebody say to me before, "Well, that means it's not against the county."

Of course it's against the county. It's against the taxpayers of the county. . . .

MR. HAYS: Well, [] there's a process where the county pays it. But . . . it's a judgment against that [] government official and against his entity.

. . .

THE COURT: . . . [I]f a tax levy against the residents of a county is not a judgment against the county, who is it against?

MR HAYS: Again, . . . I see the judgment and the collection process as being different. I think the judgment is against Mr. Gallegos in his official capacity and against his office independently. It's collected through this process [set forth in Article 8, Section 7 of the New Mexico Constitution], and it's collected from the taxpayers of the county.

*Doc. 207*, Joinder H'rg Tr. at 14:18-15:17, 16:5-23, 17:17-18:10, 35:3-13.

It is apparent that Plaintiff is not arguing that the Office of the District Attorney for the Eighth Judicial District was a county agency. Given this position and the universal and persuasive precedent (albeit unpublished and unbinding), this Court concludes that the office being sued via Plaintiff's official-capacity claims is a state agency. Consequently, it would be protected by Eleventh Amendment immunity.

Notwithstanding his unwillingness to argue that the Office of the District Attorney is a county agency for the purposes of this case, Plaintiff appears to offer one argument against the application of Eleventh Amendment immunity. Plaintiff notes that a key factor in determining whether an official is entitled to Eleventh Amendment immunity as a state official is whether a judgment for liability would be paid out of the state or county treasury. *See doc. 205* at 7. Relying on the same constitutional provision stating that actions by a local government official resulting in liability are paid out of local funds, Plaintiff's counsel argued during the September 11, 2017 hearing in this matter that the Court could fashion a remedy that does not violate the Eleventh Amendment by ordering the judgment be paid according to that constitutional process. *Id.* Specifically, he contended that the judgment could be simply collected from Colfax County via the process laid out in Article 8, Section 7 of the New Mexico Constitution. *Id.* According to Plaintiff, this collection method would mean that, for the purposes of Eleventh Amendment immunity, the judgment would be against Colfax County and not the State of New Mexico. To the extent that this argument was meant to be applied to the official-capacity claims,[5] it is unavailing.

First, a judgment against the Office of the District Attorney for the Eighth Judicial District collected via the highlighted state constitutional process would not proceed as described by Plaintiff. That office covers three counties—Taos, Colfax and Union.

---

[5] Plaintiff may have been making the "funding" argument in opposition to Eleventh Amendment immunity as to the individual claims against Defendant Gallegos.

Therefore, if indeed the process laid out in Article 8, Section 7 of the New Mexico Constitution was applicable, it would appear that the tax levy would be collected from the citizens of all three counties, not just Colfax. This likely reality undermines any suggestion that the official-capacity claims could sidestep the Eleventh Amendment immunity problem simply because only Colfax County taxpayers would be paying the judgment.

Second, and more fundamentally, Eleventh Amendment immunity is focused on legal liability and not "who pays in the end." *Doe*, 519 U.S. at 428. Plaintiff has repeatedly acknowledged—even insisted—that the official-capacity claims are brought against the Office of the Eighth Judicial District Attorney, and not against Colfax County, and that any judgment in Plaintiff's favor on his official-capacity claims would be a judgment against that office. As explained above, in analyzing whether a given entity is entitled to Eleventh Amendment immunity, "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant[.]" *Duke*, 127 F.3d at 981. The Court cannot bypass the question of whether the district attorney's office is a state entity—and thus entitled to Eleventh Amendment immunity on Plaintiff's official-capacity claims—by simply ordering that Colfax County pay a judgment, through a special tax levy, when the judgment sought by those claims would *not be against Colfax County*.

Plaintiff has conceded that he is seeking a favorable judgment on his official-capacity claims only against Defendant Gallegos in his official capacity as an agent of the Office of the District Attorney for the Eighth Judicial District. He does not seek any judgment against Colfax County or its Board of County Commissioners. *See doc. 207*, Joinder H'rg Tr. at 9:16-19 (Plaintiff's counsel stating that "the judgment, in an official capacity, would be against [Defendant Gallegos] in his official capacity or against his office, but it would not be against Colfax County."). The Office of the District Attorney for the Eighth Judicial District is a state agency. Consequently, Plaintiff's § 1983 official-capacity claims for damages against Defendant Gallegos are barred by the Eleventh Amendment[6] and shall be dismissed with prejudice.[7]

---

[6] In fact, these claims also suffer from an analytically-similar, yet distinct, flaw. A state agency is not a suable "person" under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As the operative statute provides no remedy against the state agency, one need not actually reach the issue of immunity. *See Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 779-80 (2000). However, Defendant has not raised this argument, which may constitute waiver. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005) ("by failing to raise . . . in the district court . . . that it is not a 'person' under § 1983," defendant waived the issue); *but see Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997) (suggesting that the "not-a-person" defense against § 1983 claims is not waivable). Regardless, the jurisprudence regarding Eleventh Amendment immunity and that regarding suable "persons" under § 1983 are so symmetrical that the ultimate result under either analysis will be the same in virtually all cases. This case is not one of the rare exceptions, so it is unnecessary to separately consider the "not-a-person" defense.

[7] This dismissal includes Plaintiff's Fifth Amendment takings claim for several reasons. First, Plaintiff has conceded that any remedy available for his takings claim would be against the governmental entity rather than an individual defendant. *See doc. 205* at 11. Eleventh Amendment immunity thus bars any such claim against a state entity here. Moreover, a takings claim is not ripe for review unless a plaintiff can show that he "unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation" if a state provides an adequate procedure for seeking such compensation. *Williamson Cty. Reg. Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194-95 (1985). Plaintiff has offered no evidence to show that he has sought and been refused just compensation through state procedures. Indeed, Plaintiff effectively abandoned his takings claim during the September 11, 2017 hearing, when Plaintiff's counsel stated that Plaintiff's Fifth Amendment claim was merely a

IV.    **PLAINTIFF'S INDIVIDUAL-CAPACITY CLAIMS FOR DAMAGES AGAINST DEFENDANT GALLEGOS**

Unlike the official-capacity claims against Defendant Gallegos, Plaintiff's individual-capacity claims against Defendant Gallegos are not subject to the defense of Eleventh Amendment immunity, regardless of whether Defendant Gallegos is a state or county official. *See Hafer v. Melo*, 502 U.S. 21, 29-31 (1991). Therefore, the Court denies Defendant Gallegos's Motion for Summary Judgment on the basis of Eleventh Amendment Immunity as to the individual-capacity § 1983 claims against him.

However, Defendant Gallegos has also raised the defenses of absolute prosecutorial immunity and qualified immunity against Plaintiff's individual-capacity § 1983 claims. The Court finds that (1) Defendant Gallegos is not entitled to prosecutorial immunity; (2) Defendant Gallegos violated Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments; but (3) Plaintiff has failed to meet his burden of showing that Defendant Gallegos violated clearly established law. Therefore, Defendant Gallegos is entitled to qualified immunity and the individual-capacity claims against him must be dismissed.

**A.    Defendant Gallegos is Not Entitled to Absolute Prosecutorial Immunity**

*i.    Legal Standard*

Prosecutors are entitled to absolute immunity for conduct that is "intimately

reformulation of his Fourteenth Amendment claim, and requested that the Court focus on the Fourth and Fourteenth Amendment claims instead. *See doc. 205* at 11.

associated with the judicial phase of the criminal process[.]" *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Such conduct includes all duties performed by a prosecutor "in his role as [an] advocate for the State[.]" *Id.* at 431 n. 33. These duties are not limited to a prosecutor's conduct "in initiating a prosecution and in presenting the State's case[,]" and may include actions taken "preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.*

However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (citing *Burns v. Reed*, 500 U.S. 478, 494-96 (1991)). Thus, "when a prosecutor functions as an administrator rather than as an officer of the court[,]" or when he acts in an investigatory capacity, "performing functions normally performed by a detective or a police officer," he is entitled only to qualified immunity. *Id.* (internal alteration, quotations and citation omitted). A prosecutor's investigative acts are not protected by absolute immunity because it is "neither appropriate nor justifiable that, for the same act," a prosecutor should be given the cloak of absolute immunity where a police officer would be afforded only qualified immunity. *Id.* at 273-74 (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)). In short, "[w]hen the functions of prosecutors and detectives are the same, . . . the immunity that protects them is also the same." *Id.* at 276.

*ii.    Analysis*

Defendant Gallegos asserts that he is entitled to absolute immunity because his actions "occurred in the process of carrying out his discretionary duties as a prosecutor[.]" *Doc. 160* at 5-6.  He argues that because "nothing in the New Mexico statutes related to the duties and responsibilities of district attorneys, or applicable decisions, preclude [him] from determining that the best way to address the obstructed roadway was to personally remove the obstruction[,]" he was acting within his duties as a district attorney and exercising his prosecutorial discretion by pursuing an alternative to prosecution—namely, direct removal of the gate. *Doc. 160* at 7.

The Court cannot agree that prosecutorial immunity extends to—or that prosecutorial discretion encompasses—any and all actions taken by a prosecutor as an alternative to prosecution.  While making a decision regarding whether or not to prosecute does fall within a prosecutor's discretionary duties, the claims against Defendant Gallegos do not stem from a mere decision not to prosecute Plaintiff for obstructing Red Hill Road.  Going to the location of a suspected obstruction of a public roadway and personally removing that obstruction cannot be reasonably characterized as relating to Defendant Gallegos's "preparation for the initiation of a prosecution or for judicial proceedings," as necessary to entitle him to absolute immunity.  *Buckley*, 509 U.S. at 273.

Indeed, Defendant Gallegos testified during his deposition that he took these

actions because he had decided *not to* initiate judicial proceedings, in the interest of saving time and avoiding an unfavorable result. *See doc. 160*, Ex. 1, Gallegos Dep. at 96:25-97:7 ("The consideration I had at the time was how effective a [temporary restraining order] would actually be and how quick it would take; because the last time I tried that with [another] case, it wound up just being a legal—not necessarily a nightmare—but it just got tangled up, and there was no quick action"); *see also id*. at 180:16-19 ("[I]nstead of filing charges and wasting the taxpayers' money in that end, and maybe getting worse or who-knows-what result, I decided to just go open the gate.").

In sum, the Court is unpersuaded that a decision to bypass the judicial process altogether is "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. Thus, Defendant Gallegos is not entitled to absolute prosecutorial immunity. This conclusion is further bolstered by the fact that Defendant Gallegos summoned police officers to accompany him to the gate to aid in its removal, and he was therefore performing the same functions as the police officers. *Doc. 125-1* at 7, Gallegos Dep. 44:21–45:16. Under such circumstances, the law is clear that Defendant Gallegos may invoke only qualified immunity. *Buckley*, 509 U.S. at 276.

**B.     Defendant Gallegos is Entitled to Qualified Immunity**

   *i.     Legal Standard*

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (*citing Pearson,* 555 U.S. at 231-32).  In evaluating a qualified immunity claim, the Court "must first determine whether [the] plaintiff's allegations, if true, state a claim for a violation of a constitutional right that was clearly established when [the] defendant acted." *Bisbee v. Bey*, 39 F.3d 1096, 1100 (10th Cir. 1994) (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  This is a "strict two-part test" that must be met before the defendant asserting qualified immunity again "bear[s] the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Edmunds*, 513 F.3d at 1222.  The Court may address the two prongs of the test in any order.  *Pearson*, 555 U.S. at 236.

Determining whether the allegedly violated right was "clearly established" depends on whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains."  *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (citation omitted).  While the plaintiff need not locate "a case directly on point," nevertheless "existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.

"The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson*, 555 U.S. at 231 (quotations omitted) (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  Even where an officer is mistaken as to an essential fact on which the constitutionality of his actions depends, the central question in determining whether he is nevertheless entitled to qualified immunity is "whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied" with the Constitution.  *Groh*, 540 U.S. at 566 (Kennedy, J., dissenting); *see also Creighton*, 483 U.S. at 641.

Ultimately, the Court finds that the evidence of record, viewed in the light most favorable to Plaintiff, establishes that Defendant Gallegos's actions violated both Plaintiff's Fourteenth Amendment right to procedural due process and his Fourth Amendment right against unreasonable seizures.  However, Plaintiff has failed to meet his burden of showing that Defendant Gallegos's actions amounted to violations of Plaintiff's constitutional rights under clearly established law.  Further, Plaintiff has failed to establish a constitutional violation in the first instance as to either his Fifth

Amendment takings claim or his Fourth Amendment search claim. Therefore, Defendant Gallegos is entitled to qualified immunity on all of Plaintiff's individual-capacity § 1983 claims for damages, and his Motion for Summary Judgment on the basis of qualified immunity must be granted.

> ii. *Defendant Gallegos violated Plaintiff's Fourteenth Amendment right to procedural due process and his Fourth Amendment right against unreasonable seizures.*

The Fourth Amendment's prohibition against unreasonable seizures is implicated when there is some "meaningful interference with an individual's possessory interests in [his] property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992). Plaintiff's Fourth Amendment claim is fundamentally intertwined with his Fourteenth Amendment due process claim, because a seizure is considered reasonable, and thus compliant with the Fourth Amendment, "as long as procedural due process standards are met and no unreasonable municipal actions are shown[.]" *Santana v. City of Tulsa*, 359 F.3d 1241, 1245 (10th Cir. 2004). Therefore, unless Plaintiff can show a procedural due process violation, he cannot establish a Fourth Amendment violation. For that reason, the Court will address Plaintiff's Fourteenth and Fourth Amendment violations together.

Generally speaking, the Fourteenth Amendment guarantee of procedural due process requires notice and a pre-deprivation hearing before an individual's property interests are negatively affected by governmental actors. *Marcus v. McCollum*, 394 F.3d

813, 818 (10th Cir. 2004) (citing *Fuentes v. Shevin*, 407 U.S. 67, 80-82 (1972)).  However, as discussed in more detail below, these pre-deprivation procedures are not required under certain exceptional circumstances, including (1) "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination[,]" *see Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19 (1978); and (2) where such procedures are impracticable, such as where a state employee engages in a "random and unauthorized" act of deprivation.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Parratt v. Taylor*, 451 U.S. 527, 540-42 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  In such circumstances, due process is not violated so long as an adequate and meaningful post-deprivation remedy is available.  *Id*.

      1.     Plaintiff holds sufficient property interest to be entitled to due process.

One prerequisite to the right to due process is that one holds sufficient property interest in the property subject to the governmental action.  Defendant argues that Plaintiff lacks sufficient property interest in Red Hill Road so as to entitle him to *any* procedural due process rights before state actors may interfere with that interest.  *Doc. 196* at 7.  Establishing a property interest requires Plaintiff to "demonstrate that he . . . has a 'legitimate claim of entitlement' to it."  *Adamson v. City of Provo, Utah*, 819 F. Supp. 934, 949 (D. Utah 1993) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  It does

not, however, require that the title be undisputed.  *See Fuentes*, 407 U.S. at 86 ("The

Fourteenth Amendment's protection of 'property,' however, has never been interpreted

to safeguard only the rights of undisputed ownership.  Rather, it has been read broadly

to extend protection to 'any significant property interest.'") (quoting *Boddie v.*

*Connecticut*, 401 U.S. 371, 379 (1971));[8] *see also Evers v. Custer Cty.*, 745 F.2d 1196, 1200-03

(9th Cir. 1984); *McCulloch v. Glasgow*, 620 F.2d 47, 50 (5th Cir. 1980); *Coe v. Armour*

*Fertilizer Works*, 237 U.S. 413, 424 (1915) ("To one who protests against the taking of his

property without due process of law, it is no answer to say that in his particular case

due process of law would have led to the same result because he had no adequate

defense upon the merits.").

In a case with very similar facts to the one before the Court, the Ninth Circuit

Court of Appeals held that a plaintiff was entitled to a pre-deprivation hearing on the

merits regarding her claim that a road crossing her property was private rather than

public.  *Evers*, 745 F.2d at 1200-03.  There, as here, the plaintiff had blocked public access

to a road that crossed her property.  *Id.* at 1198.  Other members of the public who had

previously used the road complained, and urged the Board of County Commissioners

---

[8] *Fuentes* dealt with the repossession of goods which had been possessed by the plaintiff-appellants under conditional sales contracts entitling them to possession and use of the goods before transfer of title.  The Supreme Court held that the appellants' "possessory interest in the goods, clearly bought and protected by contract, was sufficient to invoke the protection of the Due Process Clause" despite the fact that "[t]heir ultimate right to continued possession was, of course, in dispute," explaining that "[i]t is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods."  407 U.S. at 86-97.

("the Board") to address the issue. *Id.* In response, the Board met and signed a declaration stating that the road was public pursuant to an Idaho statute. *Id.* The plaintiff then sued the Board members under § 1983 in both their individual and official capacities, alleging a procedural due process violation. *Id.* at 1199.

The Board argued that no property interest of the plaintiff's was implicated, as their declaration did not convert a private road into a public road, but merely clarified that the road had been public all along. *Id.* at 1200. The Ninth Circuit disagreed, holding that even if the plaintiff's claim that the road was private was "probably not valid," record evidence of "at least some legal and factual basis for her claim" meant that she had asserted a significant enough property interest to entitle her to a pre-deprivation hearing on the matter. *Id.* at 1200, 1202. Therefore, the court held that there was a procedural due process violation unless the Board could, on remand, establish an interest that would counterbalance the plaintiff's interest in obtaining a fair hearing. *Id.* at 1202-03.

Similarly, the Fifth Circuit has held that a plaintiff may possess "a sufficient property interest" in a piece of land so as to entitle him to a pre-deprivation due process hearing even where title is disputed. A plaintiff need only allege "a 'significant property interest'" to trigger the hearing requirement. *McCulloch*, 620 F.2d at 50 (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). The *McCulloch* court explained that "[r]egardless of the ultimate success of plaintiffs' claim of title to the property, the

conflict between their arguable unencumbered title and the town's arguable easement was sufficient to create a significant property interest entitling plaintiffs to a due process hearing." *Id.* And denial of such a hearing is an "actionable wrong independent of the uncompensated taking." *Id.*

Therefore, the Court rejects Defendant Gallegos's argument for summary judgment on Plaintiff's procedural due process claim, which is premised on the notion that Plaintiff must have title to establish that he had a constitutionally protected interest in the road. *See doc. 196* at 7. Rather, following the guidance of *Evers* and *McCulloch*, the Court finds that even if Plaintiff does not in fact have title to Red Hill Road, Plaintiff has met his burden of establishing a sufficient property interest to entitle him to a pre-deprivation hearing.[9]

---

[9] Defendant Gallegos attempts to distinguish *McCulloch* from the case at hand on the basis that *McCulloch* concerns the actions of a municipal entity, rather than an individual state actor. More precisely, Defendant Gallegos asserts that because the due process clause provides that no "State" shall deprive any person of property without due process of law, a procedural due process claim cannot stand against Defendant Gallegos in his individual capacity, as he is not a public entity capable of providing a pre-deprivation hearing to Plaintiff. *Doc. 196* at 8. To the contrary, 42 U.S.C. § 1983 is designed to provide for private actions against individual governmental actors who cause constitutional deprivations under color of law. The assertion that a procedural due process claim cannot be brought against an individual state actor contradicts decades of § 1983 jurisprudence. *See, e.g.*, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 940-42 (1982) (explaining that a constitutional deprivation is "fairly attributable to the State" when (1) it is "caused by . . . a person for whom the State is responsible" and (2) "the party charged with the deprivation [is] a person who may fairly be said to be a state actor[,]" and ultimately holding that petitioner "did present a valid cause of action under § 1983" against individual defendants who acted under color of state law in violating the petitioner's Fourteenth Amendment right to due process); *Wolfenbarger v. Williams*, 774 F.2d 358, 365 (10th Cir. 1985); *Lavicky v. Burnett*, 758 F.2d 468, 472-73 (10th Cir. 1985); *Coleman v. Turpen*, 697 F.2d 1341, 1343-45 (10th Cir. 1982). Further, although this fact is not necessary to reject Defendant Gallegos's argument, the Court finds it worthwhile to note that Defendant Gallegos, as a district attorney, could have filed criminal charges against Plaintiff for obstructing a public road. *See* N.M.S.A. § 67-7-10 (unlawful to maintain a fence across any public road without permission from the authorities having control of such a road); N.M.S.A. § 36-1-18(A)(1) (district attorney has a duty

State law controls whether a plaintiff has alleged a sufficient property interest to have standing to sue under § 1983 for a violation of the property rights protected under the Fourteenth Amendment. *See Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992). This nuance is typically highlighted where the putative property interest is peculiar in some fashion. *See Petty v. Bd. of Cty. Comm'rs of Cty. of Wyandotte, Kan.*, 168 F.R.D. 46, 49-50 (D. Kan. 1996) (plaintiff had been awarded seized vehicle in divorce decree but had failed to take the necessary steps to transfer the vehicles certificate of title into her name); *see also Wolfenbarger v. Williams*, 774 F.2d 358, 361 (10th Cir. 1985) (holding that a plaintiff pawnbroker had constitutionally protected property rights in allegedly stolen items because Oklahoma law provides a recognized property interest to "one who possesses property without having title to it" and was thus entitled to due process). In the instant case, no such peculiarity exists. It is uncontroverted that Red Hill Road traverses Plaintiff's private property. The summary judgment record contains no evidence that it has been marked or maintained as a public road. While Defendant has presented a plausible argument that the road is indeed public pursuant to an obscure statute, it seems obvious that Plaintiff has a "legitimate" claim that it is a private road. Certainly, Defendant has presented no authority from state law to the contrary. In fact, the Court notes that Plaintiff's quiet title action in state court asserting complete

to prosecute all cases in which the state or any county in his district may be a party or may be interested). Such action would have afforded Plaintiff the requisite notice and opportunity to be heard as to whether he legally blocked Red Hill Road from public access. The argument that Defendant Gallegos had no ability to provide Plaintiff a hearing before acting to remove the gate is thus also without merit.

ownership of the road traversing his property has not been dismissed for a lack of standing.[10]  *See* N.M.S.A. § 42-6-1 (such actions to be brought only be someone "having or claiming an interest" in the property); *cf. Kinscherff v. United States*, 586 F.2d 159, 160-61 (10th Cir. 1978) (holding that members of the public do not have any degree of ownership in public roads and therefore cannot bring suit to quiet title in public highways).  Under these circumstances, the Court finds that Plaintiff has alleged a sufficient property interest in the road to be entitled to due process protections from governmental interference with that interest.

> 2.      Pre-deprivation procedures for notice and opportunity to be heard were required under the circumstances of this case.

"Due process . . . is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  Several factors are weighed when determining what procedural protections the Constitution requires in a particular case. These factors include: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Id*. (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

---

[10] Indeed, the quiet title action has proceeded through years of litigation and is currently set for trial in March 2018.  *See doc. 207*, Hr'g Tr. at 26:22-27:21, 64:13-65:23, 69:10-17.

As a general rule, the Supreme Court has held that the Constitution requires notice and a hearing before the State deprives a person of a property interest. *Id*. at 127-28 (citing numerous cases). "In some circumstances, however, the Court has held that a statutory provision for a post-deprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id*. at 128.

Circumstances in which due process can be satisfied without pre-deprivation notice and hearing can be collected in two categories. In the first category, the Supreme Court "has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards.'" *Craft*, 436 U.S. at 19(quoting *Ingraham v. Wright*, 430 U.S. 651, 680 (1977) and citing *Mathews*, 424 U.S. at 339-49)); *see, e.g., Nichols v. Fletcher*, 2007 WL 1795765 (D. Utah 2007) (unpublished) (plaintiff received due process despite lack of pre-deprivation hearing based on: (1) pre-deprivation notice from a citizen's complaint filed with the government agency and a phone call from a government agent; (2) a pre-deprivation opportunity to be heard; (3) a thorough pre-deprivation investigation; and (4) a post-deprivation opportunity to respond, afforded by an agency letter informing plaintiff he had the right to appeal). In the second category, pre-deprivation process is not required where the procedures would be impracticable, such as where a state employee

engages in a "random and unauthorized" act of deprivation. In cases falling into these categories, due process is not violated so long as an adequate and meaningful post-deprivation remedy is available. *Hudson*, 468 U.S. at 533; *see also Parratt*, 451 U.S. at 540-42.

The two removals of the gate across Red Hill Road as it entered Plaintiff's property do not fall into either category of due process exceptions. With respect to the first category, neither prerequisite is met. The removals of the gate were not minor in either length or effect. Defendant Gallegos intended the road through Plaintiff's private property to remain completely open to public access indefinitely. Moreover, the Court is unpersuaded that the pre-deprivation investigative procedures underlying Defendant Gallegos's decision to act were adequate to fit within this category. Defendant Gallegos's factual and legal investigation into whether the road was public by operation of law relied entirely on research done and provided to him by others; he conducted no independent research or investigation. *See doc. 147* at 5; *doc. 158* at 3; *see also doc. 125-2* at 10, Gallegos Dep. 158:6-159:19. Moreover, his deposition demonstrated an alarming lack of knowledge regarding the legal and factual basis upon which he made his decision. *See doc. 160-1* at 12-13, Gallegos Dep. 154:10-157:16; 171:20-172:15 (testifying, among other things, that the "status of [his] knowledge or research" when he wrote the August 3, 2011 letter was that certain "elders" had told him they had historically used the road, and he "was raised to respect and to believe what the elders tell you,

especially if it's more than one telling you"; that his basis for believing the road was a dedicated public road was that "[a]t one point, I believe it was dedicated by federal or State statute.  I remember seeing some authority on that, reference to it.  The prescription, obviously, by use . . . I don't know if it was because it was a mail route.  I think it had to do with either that or a school route; maybe both"; that "a lot of the research that I looked at had been done by . . . Luis Juarez . . . and referred to something called a – I don't recall.  There's a numeral – '602' road or something like that, anyway.  I think that had to do with the establishment of mail routes"; and that he had no opinion whether Red Hill Road is "a county road or a State highway or something else" because "it wasn't relevant to [his] analysis").  In short, his pre-deprivation investigation was not sufficiently reliable to minimize the risk of an erroneous determination.

   With respect to the second category, Defendant also fails to meet the prerequisites.  First, there is no evidence that pre-deprivation process was impracticable.  Notably, Defendant Gallegos never claimed that removing the gate on August 24, 2011 or September 10, 2011 was predicated on exigent circumstances, nor would the evidence of record support such a finding.  *See, e.g.*, *doc. 125-1* at 15, Gallegos Dep. 98:6-19 (explaining that he did not seek a temporary restraining order due to his concern that it would not be granted in a timely fashion, and that the urgency in having it granted quickly was "the gate itself . . . .  [A]ny given day, people were denied the

access that they've had traditionally, historically, and legally.  So that was the urgency."); *cf. Sargent v. United States*, 2008 WL 3154761, at *10 (E.D. La. Aug 5, 2008) (no pre-deprivation hearing necessary before removal of fences and vegetation in order to prevent catastrophic flooding).  Instead, he candidly admitted that he simply did not want to risk losing the battle in court.  *See doc. 160*, Ex. 1, Gallegos Dep. at 180:16-19.  Moreover, Defendant Gallegos cannot claim that his involvement in the removal constituted a random or unauthorized act.  Indeed, the Tenth Circuit has held that "official acts initiated and controlled by a district attorney [who shares responsibility for law enforcement in the county with the county sheriff] cannot be characterized as random or unauthorized."  *Wolfenbarger*, 774 F.2d at 365.  Consequently, the second exceptional category recognized in the *Hudson* and *Parratt* cases does not apply.

Therefore, the Court holds that Plaintiff was entitled to the Fourteenth Amendment procedural due process guarantees of notice and an opportunity to be heard prior to Defendant's final decision that the road was public, the seizure of Plaintiff's gate and the resultant opening of a road through Plaintiff's private property.

3. Defendant Gallegos did not afford Plaintiff the pre-deprivation process to which Plaintiff was entitled.

The Court now turns to whether Defendant District Attorney Gallegos afforded Plaintiff adequate pre-deprivation process before he removed, and ordered the removal, of the gate. Defendant Gallegos claims that he did. Specifically, he argues that Plaintiff received adequate pre-deprivation notice from Defendant Gallegos's letters, which informed Plaintiff that the gate was illegally blocking a public road and that Defendant Gallegos intended to take "some form of action to remedy what he considered illegal behavior." *Doc. 196* at 7. He further argues that Plaintiff received adequate opportunity to be heard by means of Plaintiff's state court quiet title action. *Id.* Together, Defendant says, these satisfied the requirements of due process. The Court disagrees.

The first requirement is that of pre-deprivation notice. "Notice of a proceeding satisfies due process if it is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Gurung v. Ashcroft*, 371 F.3d 718, 721 (10th Cir. 2004) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). To satisfy due process requirements, notice "must be of such [a] nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane*, 339 U.S. at 314 (internal citations omitted). "A primary purpose of the notice required by the Due Process Clause is to ensure that the opportunity for a hearing is meaningful." *City of West Covina v. Perkins*, 525 U.S. 234,

240 (1999).

In the instant case, Defendant Gallegos can point to three letters which could constitute notice to Plaintiff.  On September 6, 2002, he sent a letter to Plaintiff stating simply:

> I have received information that you are planning on placing a gate across the public road that accesses the Whites Peak area from Mora and Colfax Counties.  I wish to advise you that this is a public road and any placement of a gate or any other obstruction will be dealt with appropriately, including, but not limited to, the filing of criminal charges against you.  I appreciate your cooperation in this matter.

*Doc. 125*, Ex. C.  Almost nine years later on August 3, 2011, and soon after Plaintiff constructed a gate across the road, Defendant Gallegos sent another letter to Plaintiff stating:

> I have been informed that you have placed a gate on the Red Hill Road that is the historical, traditional and publicly used access to State Trust Land in the area.  This road has been used for generations by the public to access State Trust Land for many uses.  Although you do own property in the area, you do not have any authority to place a gate on this road. Therefore I am requesting that you remove the gate immediately upon receipt of this letter.  Should you fail to do so, I will take any and all steps necessary to make sure that the gate is opened and/or removed.  Thank you very much for your cooperation and please call me if you have any questions.

*Doc. 160-1* at 17.  It was after sending this letter that Defendant Gallegos, along with Defendant Ed Olona and several other individuals including officers from the Mora and Colfax County Sheriff's Departments, went to the gate on Red Hill Road, and together removed the locked gate, the barbed-wire fence, and T-posts set up at the cattle

crossing.  *Id.* at 18; *doc. 125* at 1-2; *see also doc. 125-1* at 6-12, Gallegos Dep. 42:1-52:3; 62:1-65:8; 70:12-73:24; 82:1-86:18.  On August 26, 2011, after the removal, Defendant Gallegos sent a third letter to Plaintiff stating:

> Since I did not hear back from you regarding the letter I had sent you, I have taken action to open the gate on Red Hill Road.  On August 24, 2011, I removed the barbed wire fence that was strung across the cattle guard and removed the T-posts that were placed in the middle of said obstruction.  The T-posts are stacked to one side against one of the ponderosa pine trees.  I have also cut the chain securing the metal gate and re-secured it with wire so that any cattle that may be in do not wander out.  Since this is a public road, it is important that access to the public be maintained.  Therefore should you lock the metal gate or obstruct the cattle guard in any manner, I will take action to have criminal charges filed against you for obstructing a public road.  I am hoping that you will observe the requirements of law and that I will not have to take that step.  Of course, should you have any questions, please feel free to contact me.

*Doc. 160-1* at 18.

When presented as notice for due process purposes, these letters are woefully inadequate.  First, the letters provided no notice related to Defendant Gallegos's initial determination that the road was public.  Similar to the Board of County Commissioners in the *Evers* case, Defendant Gallegos, as District Attorney, simply declared the road to be public.  While he threatens further action based upon that determination, it is clear from the letters that the determination had already been made.  In other words, Plaintiff had no opportunity to review or to challenge the evidence that certain third parties presented to Defendant Gallegos in support of their contention that the road was public, and he was only notified of the result of Defendant Gallegos's evaluation of that

evidence after the determination was final.

Second, the letters do not adequately explain the factual or legal basis for Defendant Gallegos's "ruling." One might consider the first point to be a semantic one because no deprivation occurred until Defendant Gallegos removed the gate on August 24, 2011. Yet, without Defendant Gallegos presenting the basis for his determination that the road was public in the 2002 and 2011 letters, Plaintiff would not be able to understand how to meaningfully object or present evidence to the contrary. In all of his briefing in this case on the issue, Defendant Gallegos has presented only one legal argument in support of his conclusion that Red Hill Road is public. He claims that the road was public pursuant to Title 43 U.S.C. § 932. *See docs. 151, 158* at 4-10, *202* at 4-6.[11] In the context of the disputed portion of Red Hill Road, this statute is complicated to apply and involves evidence difficult to marshal. *See docs. 147-1, 147-2, 158-1, 158-2* (expert witness deposition excerpts regarding the applicability of § 932 to Red Hill Road). However, nowhere in any of the letters to Plaintiff does Defendant Gallegos make reference to this statutory authority or the facts Defendant considered dispositive pursuant to that authority. Without identifying the basis for his determination, Defendant Gallegos left Plaintiff without any meaningful ability to even begin to present an argument to the contrary.

---

[11] The Court recognizes that other parties have presented other bases for the road to be public in the quiet title action. *See doc. 202-1; doc. 207*, Joinder H'rg Tr. at 64:13-23. Nonetheless, Defendant Gallegos has not pressed those arguments here, and the Court is reviewing only the adequacy of notice as to his actions. The Court expresses no opinion about the merits of those other bases.

Defendant Gallegos might respond that the August 3, 2011 letter did notify

Plaintiff of the legal basis of his determination—namely, "Red Hill Road . . . is the

historical, traditional and publicly used access to State Trust Land in the area." *Doc.

160-1* at 17. Even assuming that, by these generic words, Defendant Gallegos meant to

reference the authority under Section 932, such would not be the natural reading.

Admittedly, public use is an important component of the establishment of a § 932 road.

*See Luchetti v. Bandler*, 777 P.2d 1326, 1327 (N.M. Ct. App. 1989)[12] (explaining that

Section 932 is "an offer to dedicate any unreserved public lands for the construction of

highways, which offer may be accepted by public use, without action by the public

authorities. Public acceptance of this offer should be judged by the time, amount, and

character of the public use or any other evidence tending to prove or disprove

acceptance."). Assuming other requirements are met, Section 932 would ensure that

Red Hill Road was a public road if, when the land where Plaintiff's ranch now stands

was settled, the § 932 road already existed. *See Wilson v. Williams*, 87 P.2d 683, 685

(N.M. 1939) (explaining that a settler of land upon which a § 932 road has been

established "takes subject to the public easement of a right of way on such road"). The

lot in Colfax County where Plaintiff's gate was located was first patented pursuant to a

---

[12] While 43 U.S.C. § 932 "is a federal statute and it governs the disposition of rights to federal property," the Tenth Circuit has explained that it is appropriate to look to state law to aid in interpreting the statute, given that most of the "well-developed body of legal principles" of common law which Congress incorporated into the statute were "embodied in state court decisions." *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 762, 764 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006). It is therefore appropriate to look to New Mexico jurisprudence in construing the requirements of the statute.

homestead patent in 1892. *Doc. 147* at 6. Thus, for Red Hill Road to be public by operation of Section 932, the public use which established it as a § 932 road must predate 1892. The only public use to which Defendant Gallegos repeatedly referred in his August 3 letter was the use of the road to access "State Trust Land," which could not have existed prior to New Mexico's statehood in 1912. Consequently, to the extent that Defendant Gallegos provided notice to Plaintiff of a legal basis in his August 3, 2011, letter, it was inaccurate and misleading.

Third, the letters did not provide notice that Defendant Gallegos was going to physically remove the gate without any legal or judicial authorization. The precise language of Defendant Gallegos's threats changed from letter to letter. *Doc. 125*, Ex. C. ("obstruction will be dealt with appropriately, including, but not limited to, the filing of criminal charges against you"); *doc. 160-1* at 17 ("Should you fail to [remove the gate], I will take any and all steps necessary to make sure that the gate is opened and/or removed."); *id.* at 18 ("I will take action to have criminal charges filed against you for obstructing a public road."). As one would expect from a District Attorney, the focus was placed on the possible filing of criminal charges against Plaintiff. To be sure, two of the letters imply other possibilities and one ominously spoke of taking "any and all steps necessary." However, a citizen receiving such a letter from a District Attorney would reasonably be on notice that the prosecutor was threatening some action involving criminal charges or a warrant or a court order. Such a citizen would not be

on notice that the gate would be removed by and pursuant to the sole authority of the District Attorney.

Finally, the letters give no notice of an opportunity to be heard, let alone anything resembling a hearing. The first letter simply ends with the sentiment that "I appreciate your cooperation in this matter." *Doc. 125*, Ex. C. The second letter similarly thanks Plaintiff for his "cooperation" and adds only, "please call me if you have any questions." *Doc. 160-1* at 17. The third letter also states that "should you have any questions, please feel free to contact me." *Id.* at 18. None of these conclusions can reasonably be read to be offering Plaintiff an opportunity to be heard or to present objections. In no way does Defendant Gallegos state or imply that he is open to a discussion about the decision. He simply states that he is willing to answer any questions about the decision which has already been made.

For all these reasons, Defendant Gallegos's letters to Plaintiff, whether viewed separately or together, fail to satisfy the due process requirement of pre-deprivation notice.

Defendant Gallegos also failed to satisfy the second due process requirement of a pre-deprivation hearing or, at least, a meaningful opportunity to be heard. In his briefing, Defendant Gallegos does not contend that he provided a pre-deprivation hearing, because he takes the position that no pre-deprivation process was due. *See doc. 196* at 6-7; *doc. 202* at 11-12. The record reveals only two possibilities that could

44

constitute any pre-deprivation opportunity to be heard.  The first possibility is revealed

in Defendant Gallegos's deposition:

> Q:      What opportunity did you provide Mr. Stanley to challenge that
> determination and decision [that Red Hill Road was a public road]?
> A:      Well, the closing sentence says, "Please call me if you have any
> questions."
> Q:      And if he called you, what would you . . . .  Go ahead, I'm sorry.
> A:      That's an invitation to discuss that matter.  That's an indica[tion] –
> in my opinion, it's always been if you can correct me on my – on
> my position, you're free to do so.  I have an "open door" policy.  I
> do return calls.
> Q:      So if he had called you, what – what process would he have been
> given to challenge your determinations?
> A:      Again, we're just speculating.  But I'm sure I would have said,
> "Please, you know, if you have legal counsel, or if you have
> documentation, you have something to rebut or counter what I'm
> basing my position on, I'd love to see it."
> . . .
>
> Q:      So would he have had an opportunity to provide witnesses and
> documents to you?
> A:      Certainly.

*Doc. 125-1* at 16, Gallegos Dep. 104:21-105:23.  Evaluated as a procedure to satisfy the

due process requirement of a pre-deprivation hearing, it is utterly deficient.  First, as

noted above, Plaintiff was never notified about this supposed "opportunity to be

heard."  The letters from Defendant Gallegos did not imply, let alone express, any

willingness to reconsider his determination.  And, even assuming some generic "open

door" policy could ever satisfy due process in this context, the record is devoid of any

evidence that Plaintiff was made aware of such a policy.  Moreover, while Defendant

Gallegos eventually claims that Plaintiff would have had an opportunity to provide

witnesses and documents, that claim is immediately preceded by his admission that he could only "speculat[e]" about what his response to an entreaty from Plaintiff would have been, indicating he had never before contemplated affording Plaintiff such an opportunity. Finally, as noted above, based Defendant Gallegos's letters, Plaintiff could not have understood "what [Defendant was] basing [his] position on" sufficiently to provide witnesses and documentation to counter it.

The second possible argument that Plaintiff was provided a pre-deprivation hearing involves the quiet title suit filed by Plaintiff before the first gate removal. In his Reply (*doc. 202*) to his supplemental motion for qualified immunity, Defendant Gallegos argues that this suit constitutes an adequate post-deprivation remedy in the context of the *Hudson-Parratt* exception to the requirement of pre-deprivation process. *Id.* at 11-12. While the Court has previously rejected the applicability of that exception above, the quiet title suit could alternatively be seen as pre-deprivation process given that it was filed on August 11, 2011, before the removal of the gate. *See doc. 21* at 2. This possible argument is easily dismissed. While the filing of the quiet title action predated the deprivation, Defendant Gallegos did not wait for any hearing or decision in that case before coordinating the removal of the gate on two occasions. In fact, while Defendant Gallegos testified during his deposition that he did not know of the quiet title action at the time he interfered with Plaintiff's claimed interest in the road, he also testified that such knowledge "wouldn't have affected my decision," and that the existence of any

pending legal proceedings "was irrelevant to me." *Doc. 125-1* at 15-16, Gallegos Dep. 100:3-23, 101:23-102:10. Obviously, under these circumstances, the quiet title action could not constitute a pre-deprivation hearing or opportunity to be heard. *See, e.g., Soldal.*, 506 U.S. at 58-72 (due process violation where deputy sheriffs assisted property owner with eviction while eviction action was still pending in court).

In conclusion, Plaintiff has established a sufficient property interest in Red Hill Road as it passed through his property to entitle him to due process prior to the removal of the gate. Defendant Gallegos has failed to establish that the circumstances provided a constitutional basis to excuse the general requirement of pre-deprivation process. Pre-deprivation process demanded adequate notice and a meaningful opportunity to be heard. Defendant Gallegos failed to provide either. Moreover, because Defendant Gallegos's actions failed to meet procedural due process standards, the seizure of Plaintiff's gate was unreasonable and in violation of the Fourth Amendment. *See Santana*, 359 F.3d at 1245; *Soldal*, 506 U.S. at 69-71. Plaintiff has thus met his burden of showing that Defendant Gallegos violated his constitutional right against unreasonable seizures under the Fourth Amendment, as well as his right to procedural due process under the Fourteenth Amendment.[13]

---

[13] In his Complaint, Plaintiff asserts that Defendant Gallegos's actions constituted not just an unreasonable seizure, but also an unreasonable search. *Doc. 21* at 3-4. However, a search has not occurred for Fourth Amendment purposes unless a trespass is "conjoined with . . . an attempt to find something or to obtain information." *Reid v. Pautler*, 36 F. Supp. 3d 1067, 1149 (D.N.M. 2014) (quoting *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012)). There is no indication that Defendant Gallegos went to Red Hill Road to find something or to obtain information, however, as the location and existence of the

     a.  Plaintiff has failed to meet his burden of showing that Defendant Gallegos violated clearly established law.

Nonetheless, Plaintiff's individual-capacity claims against Defendant Gallegos must be dismissed because Plaintiff has failed to point to clearly established law showing that Defendant Gallegos's actions violated the Constitution. Therefore, Defendant Gallegos is entitled to qualified immunity. *Edmunds*, 513 F.3d at 1222.

"For the law to be 'clearly established,' there ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction." *Pompeo v. Bd. of Regents of the Univ. of N.M.*, 852 F.3d 973, 981 (10th Cir. 2017). The Supreme Court has warned not to define a clearly established right "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted). Instead, "the clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks omitted). In other words, we must ask "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742); *see, e.g.*, *White*, 137 S. Ct. at 551 (officer entitled to qualified immunity because parties and lower courts had "failed to identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment"). "This is not to say that an official action is protected

---

fence were known. Therefore, Defendant Gallegos is entitled to qualified immunity on Plaintiff's Fourth Amendment claim of an unreasonable search, and that claim will be dismissed.

by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Pompeo*, 852 F.3d at 981 (internal quotation marks omitted); *see also White*, 137 S. Ct. at 551. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted).

Therefore, to analyze whether the right at issue is clearly established, the Court must first determine the essential "violative nature" of the particular conduct in this case. In his briefing, Plaintiff argues that the following is the proper formulation of the issue: "Is there clearly established law allowing a governmental official acting under color of law to enter onto and seize private property without a warrant and/or without due process?" *Doc. 197* at 9. The Court must reject this formulation. First, this expression of the relevant right is at the "high level of generality" that the Supreme Court has repeatedly cautioned lower courts against. *White*, 137 S. Ct. at 552 (quoting *al-Kidd*, 563 U.S. at 742). Second, qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (quotations omitted). Thus, it would be improper for the Court to adopt Plaintiff's formulation, which takes for granted that Defendant Gallegos "enter[ed] onto and seize[d] private property," when he was acting pursuant to his belief that he was removing an obstruction from public

property.

When pressed to present a more particularized formulation of the right at issue during the September 11, 2017 motion hearing in this matter, Plaintiff's counsel offered that the issue could be encapsulated as "whether the law is clearly established that a district attorney or law enforcement official may determine unilaterally, and without researching the issue, that a piece of property such as a road is public and then search and seize that property without a warrant or due process." *Doc. 205* at 3. Unfortunately for Plaintiff, counsel could not point to a case sufficiently similar to those facts. Instead, counsel fell back on the clearly established law that warrantless searches and seizures of private property are per se unreasonable, and that no clearly established exception to the warrant requirement applies here. *Id.* at 3-4. This argument suffers from the same two defects identified above—it treats the "clearly established" question far too generally, and it fails to take into account the complicating factor of Defendant Gallegos's belief that the road was public, even assuming *arguendo* that his belief was mistaken.

When considering how to formulate the particular conduct which must be clearly established to be violative of the Constitution, several legal realities must be acknowledged. First, specificity of the right is particularly important in the procedural due process context because "[d]ue process . . . is a flexible concept that varies with the particular situation." *Zinermon*, 494 U.S. at 127. As noted above, several factors are

considered in evaluating an alleged due process violation, including: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. (internal quotation marks omitted). Given the flexible nature of procedural due process and the uncertainty that arises when weighing multiple factors, it can be difficult to determine the precise contours of due process required in a given circumstance. *See, e.g., Mullenix*, 136 S. Ct. at 308 (recognizing same in Fourth Amendment context).

Second, the instant case involves an obstruction of an allegedly public roadway. As noted above, one critical factor in the due process analysis is the government's interest. The public interest in maintaining roadways clear of obstruction is obvious, and virtually every state and lesser political subdivision criminalizes the obstruction of public roads over which they have responsibility. *See, e.g.,* N.M.S.A. §§ 67-7-1, 67-7-2, 67-7-10; Tex. Penal Code Ann. § 42.03; Idaho Code Ann. § 18-3907; Miss. Code Ann. § 65-7-7; Ga. Code Ann. § 32-6-1; La. Stat. Ann. § 48:512; N.C. Gen. Stat. Ann. § 136-90; LAS CRUCES, N.M., CODE OF ORDINANCES § 18-1; MINNEAPOLIS, MINN., CODE OF ORDINANCES §§ 466.230, 466.240; NATCHITOCHES, LA., CODE OF ORDINANCES § 15-10; KEENE, N.H., CODE OF ORDINANCES § 82-36. Indeed, the "government has a compelling

interest in ensuring that roadways are free and clear for their purpose of facilitating transportation." *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1202 (D. Az. Mar. 29, 2013) (citing cases). Given the importance of this context, the formulation of the "clearly established" right must involve public roadways or something analytically similar.

Lastly, the statutory basis on which Defendant Gallegos concluded that Red Hill Road is public is quite unusual. Most importantly for our purposes, "[u]nlike any other federal land statute[,]" acceptance of a Section 932 road is established only by public use. *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 741 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006). In other words, Section 932 was a federal "offer to dedicate any unreserved public lands for the construction of highways, which offer may be accepted by public use, without action by the public authorities." *Luchetti*, 777 P.2d at 1327. As a result, if Defendant Gallegos's determination—based on an analysis of the historic public use of the road as well as various maps provided to him by others—had been correct, the road would be public by operation of the statute alone.

With these material circumstances in mind, the Court formulates the particularized question as follows: is there clearly established law showing that it is unconstitutional for a governmental official to remove an obstruction from a road that he, with some good-faith basis, has determined to be public based upon authority which would require no further governmental action, before affording notice and a

meaningful opportunity to be heard to the person who erected the obstruction, if that person has a colorable claim that the road is his or her private property?

In his briefing on the subject, Plaintiff cites to the following cases in an effort to overcome the qualified immunity defense: *McCulloch*, 620 F.2d 47; *Hammond v. County of Madera*, 859 F.2d 797, 801 (9th Cir. 1988), *abrogated on other grounds by L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996); *Evers*, 745 F.2d 1196; *Winters v. Bd. of Cty. Comm'rs*, 4 F.3d 848, 853 (10th Cir. 1992); *Mayfield v. Bethards*, 826 F.3d 1252 (10th Cir. 2016); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970); *Soldal*, 506 U.S. 56; *Reid v. Wren*, 57 F.3d 1081, 1995 WL 339401 (10th Cir. 1996) (unpublished table case); *Wolfenbarger v. Williams*, 826 F.2d 930 (10th Cir. 1987), *abrogated in part on other grounds by Horton v. California*, 496 U.S. 128 (1990); and *DiCesare v. Stuart*, 12 F.3d 973 (10th Cir. 1993).  *See doc. 125* at 22-25; *doc. 197* at 9-19.  With the exception of *Evers*, none of these cases is sufficiently analogous to the facts at hand to satisfy Plaintiff's burden to show that Defendant Gallegos violated clearly established law.  And, as explained more fully below, the Ninth Circuit's opinion in *Evers* alone does not suffice to constitute clearly established law in this jurisdiction.

*Hammond* involved claims of trespass and deprivation of property rights under § 1983 brought by nine Chickchansi Indians against the County of Madera in California, whose Board of Supervisors had recorded two improper quitclaim deeds to obtain a right-of-way across land held in a trust patent.  859 F.2d at 799-801.  Notably, the

Fourteenth Amendment deprivation was not disputed on appeal; the County challenged only the finding that "official county policy" was the moving force behind the constitutional violation. *Id.* at 801. *Hammond* is an out-of-circuit opinion, diminishing the weight it carries in the "clearly established law" analysis. Most importantly, the facts are too dissimilar to place the statutory or constitutional question beyond debate. First, the County in *Hammond* lacked a good-faith basis for concluding that it had any interest in the disputed land. Instead, the "Board's approval and recording of improper quitclaim deeds on two occasions, without any inquiry as to their validity, and its incorporation of the road into the County system without the proper right-of-way deeds, constitute[d] reckless disregard of appellants' constitutional rights." *Id*. at 803. Further, the actions in *Hammond* did not involve removal of an obstruction pending a more final ruling from the state court, but constituted an attempted permanent and formal taking by the government through the filing of deeds.

*Winters* and *Wolfenbarger* both involve the claims of Oklahoma pawnshop owners that the warrantless seizures of certain property in their possession violated their Fourth and Fourteenth Amendment rights, because they had constitutionally protected property interests in the pawned property. *See Winters*, 4 F.3d at 850-56; *Wolfenbarger*, 826 F.2d at 931-34. Plaintiff relies on both of these cases to support the general proposition that deprivations of rights under the Fourth Amendment can also validly underlie Fourteenth Amendment due process claims. *See doc. 197* at 15, 18.

While they do support that general proposition, the facts of these cases are also not sufficiently analogous so as to have put Defendant Gallegos on notice that a person who purports to have title to a private road is entitled to due process before a district attorney or law enforcement officer, believing the road to be public, may remove an obstruction blocking public access to the road. Additionally, the Tenth Circuit in both cases relied heavily on Oklahoma law in determining whether the pawnbroker plaintiffs had protected property interests in pawned property. The nature of the property interest that Plaintiff had in the road traversing his New Mexico real property is thus fundamentally different from the nature of the property interest that the pawnbroker plaintiffs had in the personal property in their possession. Therefore, these cases do not aid Plaintiff in meeting his burden of showing that Defendant Gallegos was clearly on notice that Plaintiff was constitutionally entitled to due process before the gate could be removed from Red Hill Road.

The remaining cases suffer from the same defect. *Mayfield* involved the shooting of a dog by a police officer. The Tenth Circuit held that the shooting constituted a warrantless seizure of personal property, and further that the law was clearly established that "animals, including dogs, constituted personal property protected by the Fourth Amendment" because the Tenth Circuit had previously analyzed seizures of cattle and horses under the Fourth Amendment. 826 F.3d at 1258-59. Plaintiff has presented no similar clearly established law that a gate blocking a road whose

public/private status is in dispute is constitutionally protected personal property which a public official, acting in an investigative or law enforcement capacity, needs a warrant to remove.

*Colonnade* involved federal ATF agents' forced entry into a liquor establishment storeroom, achieved by breaking a lock, after the owner of the establishment refused them entry. 397 U.S. at 72-73. However, Congress had provided by statute that any person refusing entry to such agents would be fined $500. *Id.* at 74. Therefore, because Congress had authorized a standard of reasonableness for searches and seizures under the applicable statute, the Supreme Court held that the defendants acted unreasonably and in violation of the Fourth Amendment to instead make a forcible, warrantless entry. *Id.* at 77. The breaking of the lock is the only factual commonality between *Colonnade* and the facts at bar. Yet nowhere does either the *dicta* or the holding of *Colonnade* suggest that the breaking of the lock itself constituted a seizure of private property. It is thus inapposite.

In *Soldal*, two county deputy sheriffs assisted a mobile home park manager in evicting tenants while an eviction action was still pending against them. 506 U.S. at 58. Under the applicable state law, a tenant could not be dispossessed absent a judgment of conviction. *Id.* The evicted tenants brought a § 1983 action against the sheriffs, the mobile home park, and the manager, alleging violations of their Fourth Amendment right against unreasonable seizures and their Fourteenth Amendment right to due

process.  *Id.* at 59.  Only the plaintiffs' Fourth Amendment claim was at issue on appeal to the Supreme Court, because the Seventh Circuit Court of Appeals held that claim not to be cognizable on the basis that the Fourth Amendment "protects against unreasonable seizures of property only where privacy or liberty is also implicated."  *Id.* at 60, 66.  Therefore, the Seventh Circuit held that the removal of the plaintiffs' trailer did not constitute a "seizure" implicating the Fourth Amendment.

In reversing and remanding the Seventh Circuit's grant of summary judgment to the officers on the Fourth Amendment claim, the Court acknowledged the fear that applying the Fourth Amendment in such a context might federalize areas of law traditionally dealt with by the states, such as "routine repossessions, negligent actions of public employees that interfere with individuals' right to enjoy their homes, and the like[.]"  *Id.* at 71.  However, the Court opined that a showing of unreasonableness would have been more difficult to make under alternative facts such as "for example, that the officers were acting pursuant to a court order," and explained that "had the ejection in this case properly awaited the state court's judgment [on the eviction action,] it is quite unlikely that the federal court would have been bothered with a § 1983 action alleging a Fourth Amendment violation."  *Id*.  The Court further asserted that the fear of federalization of state law was overstated, as it was doubtful that police officers would frequently "further an enterprise knowing that it is contrary to the law, or proceed to seize property in the absence of objectively reasonable grounds for doing so."  *Id.* at 72.

The Court agrees that *Soldal* offers general constitutional principles that are applicable here—namely, that the Fourth Amendment's prohibition against unreasonable seizures can be implicated even where no liberty or privacy interests are at stake, and that an officer's actions are unlikely to be unreasonable under the Fourth Amendment if he acts pursuant to a court order or otherwise awaits the judgment of a court that has been called upon to adjudicate the controversy in question. *See* 506 U.S. at 61-65, 71. However, the case is not factually similar to the one at bar, and further, the holding relied in part on the application of Illinois statutory law providing that a tenant cannot be dispossessed absent a judgement of eviction. *See id.* at 58-59. For those reasons, *Soldal* does not constitute clearly established law that could have put Defendant Gallegos on notice that he was violating Plaintiff's constitutional rights.

Finally, *DiCesare* and *Reid* both involve the warrantless seizure of horses. Neither case involves facts similar to those at hand. *DiCesare* involved two police officers who responded to a complaint about a stray horse and entered the plaintiff's property without a warrant by climbing over a gate; there, they witnessed several malnourished animals. 12 F.3d at 975. They returned twice to the property, and on the third occasion seized thirteen horses without a warrant. The horses not euthanized were then sold. *Id.* at 975-76. The Tenth Circuit held the seizures violated the Fourth and Fourteenth Amendments, and that no warrant exceptions applied. *Id.* at 977-78.

Plaintiff relies on *DiCesare* for the very general proposition that "[i]t is

58

fundamental that 'the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement.'"  12 F.3d at 978 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)); *see also doc. 197* at 18.  This proposition is far too general to overcome a qualified immunity defense in light of particularized standard recently reiterated by the Tenth Circuit and the Supreme Court.  *White*, 137 S. Ct. at 552; *Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana*, 770 F. App'x 525, 555 (10th Cir. 2017) (unpublished).  Further, the Court notes that the *DiCesare* court did not address whether the defendants were entitled to summary judgment on the basis of qualified immunity, as the issue of qualified immunity had not been addressed below and summary judgment had been granted on an alternative basis.

     *Reid* involved a county sheriff, undersheriff, and a ranger investigating agricultural-related thefts who accompanied a man to the plaintiff's property for the purpose of retrieving a horse that the plaintiff purportedly stole from the man.  1995 WL 339401 at *1.  The officers, acting on the advice of a district attorney, warned the plaintiff that he would be arrested for concealing stolen property unless he surrendered the horse.  *Id.*  The plaintiff then sued, alleging violations of the Fourth and Fourteenth Amendments.  *Id.*  On appeal from a denial of summary judgment, the Tenth Circuit rejected the defendants' argument that the horse was not located in the curtilage of the plaintiff's home, holding that this was an issue of fact and affirming the denial of

summary judgment on the Fourth Amendment claim. *Id.* at *1-*2. Next, the court affirmed the denial of qualified immunity to the district attorney on the basis that the evidence of record was sufficient to establish an "affirmative link" between the attorney's advice and the alleged constitutional deprivation. *Id.* at *2.

Plaintiff's basis for his reliance on *Reid* is unclear, but it does share an obvious factual commonality with the facts at hand. Specifically, the Colfax County deputy sheriff who removed the gate from Red Hill Road on the second occasion, September 10, 2011, was ordered to remove it by Colfax County Sheriff Patrick Casias, who in turn was acting on the legal advice of Defendant Gallegos "that Red Hill Road was a public road, that Plaintiff was locking a gate on that road, that the road must remain open at all times to allow public access to the White Peak area, and that Plaintiff's denial of public access to the . . . White Peak[] Area was in violation of the law." *See doc. 125-2* at 3, Gallegos Dep. 119:1-120:10; *see also doc. 40-1* at 2-3. However, before the Court can address whether it is clearly established that a district attorney may be held liable for unconstitutional acts that he "authorized, supervised, or participated in[,]" *see Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990), Plaintiff must first meet his burden of showing that the acts in question were themselves unconstitutional under clearly established law. He has not done so at the level of specificity required by the qualified immunity doctrine.

Finally, the Court turns to *Evers* and *McCulloch*, which are the most analogous to

the instant case. In *McCulloch*, the defendant town in Mississippi had built a public street along a strip of land to which the plaintiffs claimed they had acquired title by adverse possession. *See* 620 F.2d at 49. The town, in turn, claimed to have acquired an easement by prescription. *Id*. While the general Fourteenth Amendment principles of due process discussed in that case directly inform the Court's decision that Plaintiff was entitled to a pre-deprivation hearing before Defendant Gallegos could interfere with Plaintiff's property interest in the road, a key distinction limits its power as clearly establishing law as relevant here. Most significantly, the town's conversion of the disputed strip of land into a public street permanently dispossessed the plaintiffs in *McCulloch* of the land. In contrast, Plaintiff continues to have the ability to use Red Hill Road, and his claim to title in the road is the subject of a pending quiet title action. This distinction is crucial when considering how much *McCulloch* should have informed Defendant Gallegos's decision making.

Finally, the Court turns to *Evers*. *See* 745 F.2d 1196. As here, a plaintiff obstructed public access to a road traversing the plaintiff's private property, based on a belief that the road was private. *Id.* at 1198. Acting on its determination that the road was public by operation of statute, the Board of County Commissioners issued a declaration to that effect. *Id*. As noted above, the Ninth Circuit held that the plaintiff had a colorable claim giving her a constitutionally protected property interest in the road, even if her claim was ultimately meritless, because there was "some legal and

factual basis for her claim that the road is private." *Id*. at 1200.  The court further rejected the lower court's conclusion that there was no deprivation of a property interest because the county had not taken control of the road, explaining that "[t]he County did everything it could, short of actually tearing down the gates, to open the road to members of the public, and officially endorsed their use of the road.  A property owner's right to exclude others is 'universally held to be a fundamental element of the property right.'" *Id*. at 1201 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 179-90 (1979)).  Having rejected these "standing" arguments, the court concluded that, if the County could not show an "interest that would counterbalance [plaintiff's] interest in obtaining a fair hearing on her position," the County would have "violated [plaintiff's] right to due process if it declared the road public without giving her notice and an adequate opportunity to be heard." *Id*. at 1203.  However, and importantly in this context, the court affirmed the grant of summary judgment on the basis of qualified immunity to the individual Board members, holding that the law was not so clearly established that a plaintiff is entitled to a pre-deprivation hearing under such circumstances as to put the Board members on notice that their actions were unconstitutional.  *Id*.

The same reasoning obtains here, except that Defendant Gallegos did in fact "tear down the gate[]" in this case.  Indeed, if the Ninth Circuit's opinion in *Evers* had been issued by the Tenth Circuit or by the Supreme Court, it would likely be sufficiently

analogous to the facts at hand to amount to clearly established law. However, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Wilson*, 625 F.3d at 690. One case from another circuit court, standing alone, cannot suffice to meet the "clearly established" prong. *See, e.g., Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990) (weight of authority from six circuit courts of appeals is sufficient to show clearly established right); *Weigel v. Broad*, 544 F.3d 1143, 1174 (10th Cir. 2008) ("Cases from other jurisdictions are relevant only if they are on point and collectively form what we might call the weight of authority."). Even adding *Evers* to the less analogous *McCulloch* opinion, these two out-of-circuit opinions would not constitute "the clearly established weight of authority from other courts." *Wilson*, 625 F.3d at 690.

Therefore, Plaintiff has not met his burden to establish that the right violated by Defendant Gallegos was clearly established, as necessary to overcome the qualified immunity defense as to Plaintiff's individual-capacity claims. Defendant Gallegos's motion for summary judgment on the basis of qualified immunity will therefore be GRANTED as to Plaintiff's individual-capacity § 1983 claims for damages.

## V. PLAINTIFF'S CLAIM FOR INJUNCTIVE RELIEF

In addition to his claims for damages, Plaintiff seeks injunctive relief against all Defendants, "enjoining and restraining [them], their respective agents, representatives and employees, from trespassing on Plaintiff's property, from damaging Plaintiff's property, or from interfering with any and all measures taken or which may be taken by Plaintiff on the Stanley Ranch to maintain the Roads as private roads and to prevent unauthorized use of the Roads including, but not limited to, Plaintiff's gating, fencing or otherwise obstructing the Roads on the Stanley Ranch." *Doc. 21* at 11. Defendant Gallegos's Motion for Summary Judgment on the basis of Eleventh Amendment immunity does not specifically address the injunctive relief claim. *See generally doc. 160.* The same is true of both his initial and supplemental briefing seeking summary judgment on the basis of qualified immunity. *See generally docs. 115, 196.* However, as both of these Motions, taken together, seek summary judgment as to all of Plaintiff's claims, the Court must address the request for injunctive relief in order to fully rule on the Motions.

Claims for injunctive relief against governmental officials are not foreclosed by qualified immunity. *See Hammons v. Saffle*, 348 F.3d 1250, 1257 n.1 (10th Cir. 2003) (citing *Creighton*, 483 U.S. at 646). Further, the Eleventh Amendment bar generally does not apply in suits seeking only prospective relief from violations of federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). Such suits can proceed against defendant state

officials, if the suit does not implicate special sovereignty interests and the plaintiffs: (i) are suing state officials rather the state itself; (ii) have alleged a non-frivolous violation of federal law; and (iii) seek prospective equitable relief rather than retroactive monetary relief from the state treasury. *See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior*, 160 F.3d 602, 609 (10th Cir. 1998). Defendant presents no argument that Plaintiff's request for injunctive relief fails to satisfy these requirements. Accordingly, the Court will deny summary judgment to Defendant Gallegos as to Plaintiff's claim for injunctive relief.

### VI.    CONCLUSION

Plaintiff's official-capacity § 1983 claims for damages against Defendant Gallegos arising from the Fourth, Fifth, and Fourteenth Amendments are barred by the Eleventh Amendment. However, Defendant Gallegos is not entitled to absolute prosecutorial immunity as to any of Plaintiff's claims. Thus, his Motion for Summary Judgment on the basis of absolute prosecutorial and Eleventh Amendment immunity (*doc. 160*) is GRANTED IN PART and DENIED IN PART. Plaintiff's official-capacity claims for damages are hereby DISMISSED WITH PREJUDICE.

Viewing the facts in the light most favorable to Plaintiff, he has established that Defendant Gallegos violated both his Fourth Amendment right against unreasonable seizures and his Fourteenth Amendment right to due process. However, Plaintiff has met only one prong of the "strict two-part test" required to overcome Defendant

Gallegos's qualified immunity defense.  Specifically, Plaintiff has failed to show that Defendant Gallegos acted contrary to clearly established law.  Accordingly, Plaintiff's individual-capacity § 1983 claims for damages against Defendant Gallegos arising from the Fourth and Fourteenth Amendments are hereby DISMISSED WITH PREJUDICE.

However, Defendant Gallegos is not entitled to qualified immunity as to Plaintiff's claim for injunctive relief.  Nor is the Eighth Judicial District Attorney's Office entitled to Eleventh Amendment immunity against that claim.  Therefore, Defendant's supplemental motion for summary judgment on the basis of qualified immunity (*doc. 196*) is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
United States Magistrate Judge
**Presiding by Consent**